STATE OF NORTH CAROLINA v. CHARLES FRANCES HARDY, JR.

No. 278A93

(Filed 30 December 1994)

**1. Evidence and Witnesses §§ 1294, 1289 (NCI4th)— noncapital first-degree murder—confession—trickery—implied promises**

The trial court did not err in a noncapital first-degree murder prosecution by denying defendant's motion to suppress inculpa-

**STATE v. HARDY**

[339 N.C. 207 (1994)]

tory statements where the trial court found as fact that prior to the interview defendant was not arrested; he was given *Miranda* warnings, he understood those warnings, and he waived his rights; the interrogating officers wore civilian clothing, displayed no weapons, and the environment was not intimidating; defendant was calm and in control of his faculties; he was told that he was free to leave; he had experience with the criminal justice system; he was thirty-five and had worked in responsible managerial positions in different businesses; defendant stated that Agent Crawford was cordial during the interview and that he did not feel threatened; and the interview lasted thirty-six minutes. Although Agent Crawford conceded that some of his statements to defendant were untrue and several contained statements which defendant contends included implicit promises or threats, the untrue statements alone do not establish coercion, many were ambiguous, there were clearly times when Crawford was simply urging defendant to confess in order to ease his conscience, and defendant's voir dire testimony tends to belie the assertion that his confession was coerced.

**Am Jur 2d, Evidence §§ 728 et seq.**

**Admissibility of confession as affected by its inducement through artifice, deception, trickery, or fraud. 99 ALR2d 772.**

**Comment Note: Constitutional aspects of procedure for determining voluntariness of pretrial confession. 1 ALR3d 1251.**

**2. Evidence and Witnesses § 1247 (NCI4th)— noncapital first-degree murder—defendant's clothes at time of crime—no necessity to renew Miranda warnings**

The trial court did not err in a noncapital first-degree murder prosecution by denying defendant's motion to suppress the clothes he was wearing at the time of the murder, which were recovered in some woods following defendant's statement to officers, on the ground that defendant's *Miranda* warnings had grown stale. Even if the warnings had grown stale, defendant's argument would fail because he seeks to exclude physical evidence and not the statements given by him; moreover, the record reveals that there was no interrogation of defendant which led to this discovery.

STATE v. HARDY

[339 N.C. 207 (1994)]

Am Jur 2d, Criminal Law §§ 788 et seq.; Evidence § 749.

3. **Searches and Seizures §§ 53, 63 (NCI4th)— noncapital first-degree murder—search of defendant's vehicle—plain view—consent**

The trial court did not err in a noncapital first-degree murder prosecution by denying defendant's motion to suppress evidence obtained without a warrant where officers, being called to the scene of a dead body in a restaurant, discovered in the restaurant a pocketbook with hair on it that was later determined to be hair of the victim; officers later witnessed defendant walking near his car looking in the window; he appeared to be nervous; the officers eventually approached the car and saw a bloody money bag in the bed of the station wagon; hair and blood on the bag was later determined to be consistent with the victim's hair and blood; and a search of the car also revealed a bloody sock. The officers were lawfully in the restaurant and, while the record is not totally clear, the pocketbook appears to have been found near the body on the floor; the items in the car were visible through the window and so were in plain view; defendant signed a consent form; he was advised that he did not have to consent to the search, the form was read aloud to him, and he appeared to understand what he was doing; he was not in a coercive environment and his actions were the product of his free will; and, although he was not given his *Miranda* warnings, *Miranda* warnings are not necessary prior to obtaining a consent to search.

Am Jur 2d, Searches and Seizures §§ 55, 83.

What constitutes "custodial interrogation" within rule of *Miranda v. Arizona* requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.

Applicability of "plain view" doctrine and its relation to Fourth Amendment prohibition against unreasonable searches and seizures—Supreme Court cases. 110 L. Ed. 2d 704.

Validity, under Federal Constitution's Fourth Amendment, of search conducted pursuant to consent—Supreme Court cases. 111 L. Ed. 2d 850.

**4. Evidence and Witnesses § 876 (NCI4th)— noncapital first-degree murder—victim's diary—recitation of facts—not admissible under state of mind exception**

The diary of a murder victim was not admissible under the state-of-mind hearsay exception in the noncapital first-degree murder prosecution of her husband where the diary described an incident in which defendant had hit and slapped the victim, thrown water, dishes, ashtrays, and paper at her, and screamed that he was going to kill her. The statements in the diary are not statements of the victim's state of mind, but are merely a recitation of facts. Mere statements of fact are provable by other means and are not inherently trustworthy. Moreover, the diary is at best speculative as to the victim's state of mind and contains indications that she was not intimidated by defendant.

**Am Jur 2d, Evidence § 866.**

**5. Evidence and Witnesses § 1941 (NCI4th)— noncapital first-degree murder—diary of victim—not admissible**

There was error which was not prejudicial in a first-degree murder prosecution where the court admitted statements from the victim's diary which recounted assaults upon her and a threat to kill her by defendant. Although the State contended that the statements were admissible as tending to show a bad relationship between the victim and defendant and were not offered to prove the truth of the statements, to the extent the State relies upon the assaults and threat contained in the diary to establish the relationship between Karen and defendant, it is using the diary entry for the truth of the matter asserted. To whatever minimal extent the victim's relationship with defendant is probative of defendant's state of mind, which was the central issue in the case, that probative value is substantially outweighed by the danger that the jury would misuse the diary entry, which sets forth two assaults by defendant upon Karen and a threat to take her life, as proof that defendant actually committed these acts. However, most of the diary entry was repetitive of other testimony, which went much further in describing the assault and threat. The only harmful statement in the diary entry not contained in the other testimony was that defendant had hit the victim in the head and slapped her across the face on a particular occasion, but there was other testimony of an assault around that time and, in light of the subsequent more severe assault and the weighty evidence against defendant, including his inculpatory statements, there is

STATE v. HARDY

[339 N.C. 207 (1994)]

no reasonable possibility that the admission of the diary entry affected the outcome of the trial. N.C.G.S. § 15A-1443(a).

**Am Jur 2d, Evidence § 1074.**

**6. Evidence and Witnesses § 701 (NCI4th)— noncapital first-degree murder—victim's diary—instruction**

There was no prejudicial error in a noncapital first-degree murder prosecution where the jury was instructed that it could not consider the evidence in the victim's diary to prove the character of the defendant, but was in effect instructed that it could consider the contents of the diary entry as substantive evidence for other purposes. Even if Rule 403 did not require the exclusion of the diary entry, the evidence contained in the diary was not admissible to show defendant's character or anything else beyond the extent to which those matters are shown by the victim's state of mind. However, in light of other evidence, there is no reasonable possibility that the outcome was affected by the erroneous instruction.

**Am Jur 2d, Trial § 1283.**

**7. Evidence and Witnesses § 3052 (NCI4th)— noncapital first-degree murder—impeachment of witness—marijuana use**

There was no error in a noncapital first-degree murder prosecution where defendant contended that the court prevented him from impeaching a witness based upon marijuana use and poor memory, but, if there was error in sustaining the State's initial objections, it was cured by the later ruling permitting inquiry into the witness's marijuana use. Defendant chose not to ask about the marijuana use and cannot now complain.

**Am Jur 2d, Witnesses §§ 591-595.**

**Use of drugs as affecting competency or credibility of witness. 65 ALR3d 705.**

**8. Homicide §§ 250,253, 252 (NCI4th)— noncapital first-degree murder—premeditation and deliberation—evidence sufficient**

There was sufficient evidence of premeditation and deliberation in a noncapital first-degree murder prosecution where a threat defendant made to kill his wife within one week of the murder is strong evidence that defendant premeditated the mur-

der of his wife; his actions in arriving at the restaurant, keeping the lights off and awaiting the arrival of his wife also tend to indicate premeditation; the manner in which he obtained a knife, held his wife down, and inflicted numerous stab wounds shows an intent to kill formed before the murder; much of the evidence stated above is also probative to show that defendant killed his wife in a cool state of blood; defendant's actions after the killing especially indicate that he deliberated the killing of his wife in that he immediately attempted to make the killing seem connected to a robbery, soon attempted to destroy incriminating evidence, and returned to the restaurant where he feigned shock upon finding the fate of his wife and concocted an alibi which he repeatedly told the police.

**Am Jur 2d, Homicide §§ 437 et seq.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment for murder in the first degree entered by Johnston (Robert), J., at the 30 November 1992 Criminal Session of Superior Court, Cleveland County. Heard in the Supreme Court 13 April 1994.

*Michael F. Easley, Attorney General, by William B. Crumpler, Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for the defendant-appellant.*

EXUM, Chief Justice.

On 20 April 1992 defendant was indicted for the murder of his wife. Defendant was tried noncapitally, found guilty of first-degree murder, and on 15 December 1992 he was sentenced to life imprisonment.

Defendant and his wife, Karen Hardy, were married on 4 July 1980. They had two children together and Karen had a daughter from a previous marriage. They opened a restaurant, the Mountaineer Restaurant, in King's Mountain. Their marriage, however, turned sour and they eventually separated; in August 1991 defendant moved out of the family home. Defendant slept at the restaurant until March

1992 at which time he moved into a mobile home. He and Karen continued, however, to operate the restaurant together.

In January or February of 1992 Chad England, who lived with the Hardys, witnessed defendant and Karen arguing at the restaurant. Defendant attempted to strike her with his open hand but Karen deflected the blow.

On 27 February 1992 defendant and Karen had another altercation at the restaurant according to Alan Davis, who worked at the restaurant. It occurred around 9:30 or 10:00 p.m. and concerned defendant's desire to be reunited with his wife. Defendant was upset and threw items around the restaurant. As defendant's wife left the restaurant, he said, "Karen, I will kill you, bitch." Defendant followed Karen to her car where he pounded on the car and attempted to enter the car. He managed to get inside and started beating Karen. She attempted to block the blows. Davis removed defendant from Karen as defendant put his hands around her neck. Karen then drove off. Defendant was very upset and angry. Davis described defendant as having an explosive temper, and arguments between defendant and Karen were usually started by defendant.

Karen made an entry in her diary regarding the incident in the restaurant; it stated in part that defendant "[s]creamed he was going to kill me." It also indicated that a harassment charge had been filed against defendant. The full diary entry is set forth in Issue IV. This diary was found by Karen's mother after her death.

On 4 March 1992 Roy Pennington, who operates a produce stand near the restaurant, saw Karen arrive at the restaurant at 4:50 a.m. Mike Medlin, a delivery man for a meat packing company, arrived at the restaurant at 6:30 a.m. to make a delivery. There were no lights on, which was unusual. He entered and found Karen's body on the kitchen floor; her blouse was pulled up and one breast was exposed. He told a companion to call the police.

Defendant soon arrived at the restaurant. He drove up in his station wagon and asked Medlin and Evalina Thompson, who had arrived on the scene, if something was wrong inside. He entered the restaurant, turned the lights on, and said, "Oh, my God, that's my wife." Defendant then went to the restroom, whereupon Medlin heard him make noises as though he were vomiting.

Officer Ben Melvin of the King's Mountain Police Department arrived between 6:45 and 7:00 a.m. He spoke to defendant, who said

he had awakened late and called his son, who informed him that Karen had already left for the restaurant. Defendant said he called the restaurant but there was no answer. He then went to the restaurant, where he found two men outside. He said there was supposed to be money inside. Defendant was nervous and upset; Melvin heard defendant making vomiting noises in the restroom. The drive-through window was ajar and, according to an officer, appeared to have been jimmied; a candy machine and soda bottles were overturned on the floor near the window.

Officer Houston Corn arrived around 6:47 a.m. He observed defendant at a table in the restaurant. Defendant was nervous but not crying. Defendant exited the restaurant with others at the request of Corn. Corn noticed defendant pacing back and forth in front of the restaurant. As he walked past his vehicle, defendant would glance in the window on the passenger side of the back door. Defendant walked by at least three or four times looking in the back.

Officer Corn then walked by the vehicle, at which time he saw a beige jacket inside. Beneath the jacket was a beige money bag with blood and hair on it. Corn described this finding to Lieutenant Reynolds. Reynolds then looked in the station wagon and saw the items also. The back seat had been folded forward to make a flat cargo area. The bag was on the back of the rear seat near the passenger window. The doors to the station wagon were unlocked.

Agent Crawford and Reynolds approached defendant and asked him to go to the police department. Crawford identified himself and said he needed to speak with defendant if defendant were willing. Crawford asked defendant if he was the victim's husband and defendant said that he was. Crawford asked defendant if he would be willing to talk at a later time, and defendant said yes. Crawford then asked if defendant would like to go to the police department, and defendant said that he would because he would like to get away from the crime scene.

Corn transported defendant to the police department. At approximately 9:00 a.m. defendant signed a Miranda waiver form. Defendant then made a statement which was recorded. He stated that he went to the restaurant at 5:30 a.m. to try to talk with his wife. His intent upon going to the restaurant was that he wanted her back. He left the lights off "[b]ecause [he] just wanted to talk to her." Upon her arrival he said, "Karen, let's talk." She was angry. They had a confrontation during which she called him a homosexual. He explained that his wife

**STATE v. HARDY**

[339 N.C. 207 (1994)]

had known that he was a homosexual and that she said she was never going back to a homosexual like him. Then "it just snapped." He got a knife from the kitchen, held his wife down, and stabbed her. She quit moving. Defendant took the money in an attempt to make the crime appear to involve a robbery. He then left and went back to his trailer. He said he threw his clothes out as he was driving. Defendant said he spent the previous night with a friend, Marty Kee, who knew nothing of the murder.

After the interview defendant and officers searched the highway unsuccessfully for the clothes defendant said he had thrown out. They then went to the home of Martin Spencer, a friend of defendant, at defendant's direction. Officers spoke with Spencer, after which officers searched the wooded area near Spencer's trailer.

Martin Spencer testified that on 3 March 1992 defendant arrived at his home between 8:00 and 9:00 p.m. and said his wife wanted a divorce. Defendant asked if he could spend the night there. They went to bed between 11:00 and 11:30 p.m.

Spencer arose at 6:00 a.m. and noticed that defendant was gone. Defendant soon arrived wearing sweat pants with blood on them. Spencer asked defendant about the blood. Defendant said that he had killed his wife at the restaurant with a knife by cutting her jugular vein. He said the "bread man" saw him leaving the restaurant. Defendant and Spencer went to defendant's trailer where defendant changed into new clothes and placed his old clothes in a plastic bag which he asked Spencer to burn. As Spencer was leaving defendant's trailer, defendant said, "Burn them clothes, now, Marty. Burn them because the bread man saw me leaving and this here's evidence." Spencer returned to his trailer and hid the clothes in the woods. He burned some garbage to make defendant think he was burning the clothes, after which defendant left. Later that day, at about 1:30 p.m., an officer went to Spencer's trailer. Spencer took him to the bag of clothes in the woods.

On that same day, after defendant signed a consent to search form, SBI agent William Lane examined the vehicle in which the money bag had been seen. At about 1:50 p.m. he entered the car and retrieved the money bag, in which he found three bank bags containing $700. He also seized a sock from the vehicle. The money bag appeared to have blood and hair on it.

An autopsy revealed that the victim had multiple wounds to her chest, neck, head and hands. Several of the wounds were defensive wounds. The victim bled to death as a result of both of her carotid arteries being severed.

A forensic serologist for the SBI analyzed several items found in connection with the investigation. The sock and money bag had blood on them consistent with that of the victim. Hair on the money bag was consistent with the victim's head hair. Numerous items of clothing in the plastic bag in the woods had blood consistent with that of the victim; they were a pair of jockey shorts, a shirt, a jacket, a sock, blue jeans, and sweat pants.

Defendant wrote a letter to Karen's mother in which he expressed his sadness over her death and made incriminating statements such as, "I know there are no words that could be said to adjust to the loss I have caused all of us," and, "I will also live in a sure hell in my heart and my mind for what I have done . . . ."

I.

[1] Defendant first argues that the trial court erred in denying his motion to suppress inculpatory statements he made to officers Crawford and Reynolds on the ground these statements were involuntary. Defendant moved to suppress these statements. The trial court conducted a voir dire hearing during which officers Crawford, Reynolds and Corn and defendant testified. The trial court then made findings of fact and conclusions of law and denied the motion.

Evidence at the voir dire hearing tended to show the following: Crawford spoke to defendant at the scene and explained that it would be necessary at some point to talk with him about what he might know about the murder; he then said he would be back with him in a few minutes. Defendant said that would be fine. Corn and Crawford asked defendant at the restaurant whether he would mind riding to the police department so officers could find out what he knew. Defendant was not arrested; he was told that he could leave but never asked to do so. Defendant's breath did not smell of marijuana or other odors. His speech was clear, and he was responsive but nervous. Before defendant left the restaurant Crawford asked defendant whether he understood that he was not in custody. Defendant testified that in fact he wanted to get away from the crime scene.

Defendant rode with Corn to the station; they did not speak on the way. Reynolds and Crawford rode together to the station in a sep-

STATE v. HARDY

[339 N.C. 207 (1994)]

arate car. Before leaving the scene, Crawford learned that defendant had been seen earlier that morning at the restaurant; he also learned that defendant and his wife had been having domestic problems, including a fight at the restaurant. At the police station Corn took defendant to a room and asked if he wanted something to drink. Defendant asked for water, which Corn obtained. Reynolds and Crawford sent word to Corn that he should bring defendant to the office of the Chief of Police.

Defendant was taken to the Chief's office. The dimensions of the office were 15 feet by 20 feet, it was carpeted and contained a desk, a computer, and several chairs. Reynolds and Crawford wore civilian clothing and they did not display weapons. Defendant was offered a cup of coffee, which he accepted. Defendant was asked if he needed to use the restroom. Defendant was attentive and seemed to understand what was said to him as Crawford read him the Miranda warnings. Reynolds would not have let defendant leave if he had wanted to do so based on the money bag in defendant's vehicle. Crawford told defendant that he was not in custody.

Crawford then advised defendant of his Miranda rights and warnings. Defendant said he could read and write. Crawford read the entire form and had defendant read along with him. Crawford then reviewed the Miranda rights individually and defendant responded that he understood and he initialled each of the rights. Defendant indicated that he wanted to talk to Crawford and Reynolds without an attorney. Defendant signed the waiver at 9:00 a.m. Crawford understood that he did not have probable cause to detain defendant if defendant had asked to leave.

Crawford first obtained perfunctory information from defendant, such as his age and address. He then stated, "I don't know any of the situation," and prodded defendant about his domestic problems. Defendant explained that he and his wife had been having problems. Crawford then turned the examination toward the events of the night before and that morning. Defendant explained that he awoke late, called the house of his wife who had just left, and arrived at the restaurant to find his wife's dead body.

Crawford then asked, "Can I just be right honest with you?" and said, "I think you killed her." Defendant denied killing his wife and Crawford responded, "What if I tell you that I can prove that you did?" After more denials, Crawford said:

> Well, somebody saw you in there when all of it was going on, you and her fighting and arguing before the time you say. You were there before the time that you said you got there and the Jesse Jones [sic] was there. The Phillips 66 station saw you there.

Defendant said, "They didn't see me there," and Crawford responded, "They certainly did."

Defendant said that someone was setting him up. Crawford expressed his disbelief and then said, "I want to hear your side of it rather than it just appear that you're a cold-blooded murderer. I don't think you are, though. I think something just happened. Either she hit you or something caused you to go off. And she can't tell me her side of it." After more denials by defendant Crawford said, "I can put you there, and I can put you being the one that killed your wife." After more denials he continued:

> Yeah, I know you did, and all I want to know is why, and that is important to you, because that has to do in the criminal system—that is going to have a lot to do with how you are treated and what happens to you. If you don't tell me the reason, whether she threatened you or whether she hit you or whatever, then all we are going to look like is that you just went there and killed her. See, she is not going to be able to tell us her side of it. All we are going to be able to know of why is from you. And the why is important for you and everybody else. . .

After more denials of guilt, Crawford reiterated his certainty of defendant's guilt and said, "It's very important that you tell your side of it. It's not a fact of whether or not you did or didn't. It's not a fact of whether we can prove it or not prove it." Defendant then said, "She had a boyfriend that threatened to kill me." Crawford then said:

> . . . I know it wasn't somebody else. All I want to know from you is why. And that is very important. Your side of it is very important. And you are going to feel better when you tell the whole thing that led up to it. If she had a boyfriend, that's jealousy. I know what boyfriends are like if you're married. I'm going to be able to understand what you are going to tell me, and you are going to feel better telling me your side of it. 'Cause if your side is not told, it's going to appear to be a lot worse than it looks. I mean, you know, it's obvious to me that there was an argument. It's obvious to me that it moved around in the restaurant, that it

**STATE v. HARDY**

[339 N.C. 207 (1994)]

didn't just happen in one place. And what I want you to do is tell me your side of it. It's important. It's important to you.

Defendant again denied his guilt, and Crawford tried again to obtain a confession. He then stated, "And you are going to feel better telling me. It's going to be like a big weight has lifted off of you when you tell your side of it." After more denials, Crawford said, "Charlie, I know you did, and I can prove it. If you want to keep saying that, it's going to be very hard. It's going to look very bad." Defendant then asked, "How can you prove I killed my wife?" to which Crawford replied:

> Because I don't think you're a violent person. I don't think you intended to do what you did. I think it escalated. I think it started out, and she either said something to you or hit you or threatened you or did something to cause what happened up there, and the only way I'm going to know that's from you. Or you can just let it look like it appears and we'll not say no more to you and everybody's going to think the worst. Or you can tell exactly what happened. It's entirely up to you now. But I know you were there, and I know you were responsible for her death. But it's very important for you to tell me how it happened. It ain't going to go away. I'm not going to go away. Lieutenant Reynolds is not going to go away. But it's way up here right now, and it looks the worst that anything can look, is way up here. And how you—when you give your explanation determines if it stays up here or if it comes down to here.[1] Domestic things happen every day, Charlie, and you don't live with somebody as long—I lost my train of thought. You don't—you don't live with somebody and be married to them and not have problems. Now, I want you to tell me your side of it.

At that time defendant made incriminating statements. The entire examination took thirty-six minutes.

On voir dire Crawford explained many of the statements he made during the interrogation of defendant. When he told defendant someone had seen him in the restaurant, he was referring to his having been told that they had fought in the restaurant in the past. Crawford admitted that he lied to defendant in order to find out the truth. He denied "holding out hope" for defendant if defendant confessed. He did not intend to threaten defendant. When Crawford said it would be hard on defendant, he meant that it would be hard on him and his

---

1. Testimony revealed that Crawford raised his hands to his head while saying, "it's way up here right now," and lowered them while saying, "it comes down to here."

family in general; he did not mean to imply that the State would make it harder. During the interrogation Crawford believed that defendant killed his wife, but he did not know how it happened.

Defendant also testified about the interrogation. He was thirty-five years old. He completed high school and some college courses. He owned and managed the restaurant where the killing took place. He had been arrested before for indecent liberties with a child at which time he was given Miranda warnings. He was somewhat familiar with the criminal justice system. At around 6:00 a.m. on the morning of the murder he smoked a marijuana cigarette. He had developed a tolerance for marijuana.

During the interview he understood his rights and Crawford's questions. He never expressed a desire to leave, or for an attorney. Crawford was friendly during the interview. Defendant did not feel that he was free to leave. He felt some of the things Crawford said were not true. Regarding the interview, defendant testified as follows:

Q. Did you think that Agent Crawford was making any threats towards you?

A. Uh, not actual threats.

Q. Then what did you think?

A. Well, I feel like he was, you know, baiting me and leading me on, you know, and that type of thing.

Q. All right, during the questioning, did you think that he was holding out some kind of hope for you?

A. Yes.

Q. And why did you think that?

A. Just the way he went about the interrogation, you know. Telling me that if I would, you know, tell what happened that things wouldn't be as bad as they were and that type of thing.

. . . .

Q. Now, the officer—or did the officer tell you that it would be easier on you or you would feel better if you told—told what happened?

A. Yes, sir.

Q. When he said that, what did you think he meant, that it would be easier on you?

A.   Well, I—I guess I felt, you know, the whole situation, as a whole, would be easier.

Q.   Do you recall the officer telling you by hand motions that it looked like it was way up here but if you told, it would be down here?

A.   Yes, I do believe I remember that.

Q.   Okay, did he use hand motions?

A.   Yes.

Q.   What did you think he meant by that?

A.   Well, by, you know, the—the severity of, you know, what had happened.

Based on the voir dire evidence, the trial court made the following findings of fact: Defendant was nervous but not crying at the restaurant. Defendant understood Crawford's questions at the scene. Defendant was asked to go to the police station. He was not placed under arrest, nor was he in handcuffs or shackles. He was given a drink at the station, and there is no indication that any request of defendant was denied. Reynolds and Crawford wore civilian clothes and did not display weapons. There was no evidence that the physical setting was intimidating to defendant. Defendant was in control of his faculties. Defendant was told he was free to leave. Defendant's rights were explained to him; he read them, and he signed the waiver form. Defendant had experience with the criminal justice system. Defendant understood the questions asked of him. He had smoked marijuana at 6:15 a.m. that morning. Defendant had developed a tolerance for marijuana, and there was no evidence that the marijuana affected defendant's ability to understand his rights or the questions asked of him. Defendant was thirty-five, completed high school and other courses and worked in responsible positions in businesses. Crawford questioned defendant in a friendly manner. Defendant did not feel he was free to leave. He never asked to leave nor was he prevented from leaving. Crawford's statements to defendant indicating that defendant had been seen fighting with his wife that morning were "not correct." Crawford was trying to find out the truth and had no intention of threatening defendant. The trial court then concluded as a matter of law that defendant's statements were not involuntary and denied defendant's motion to suppress.

The test for voluntariness in North Carolina is the same as the federal test. *State v. Jackson*, 308 N.C. 549, 581, 304 S.E.2d 134, 152 (1983), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). If, looking to the totality of the circumstances, the confession is "the product of an essentially free and unconstrained choice by its maker," then "he has willed to confess [and] it may be used against him"; where, however, "his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Schneckcloth v. Bustamonte*, 412 U.S. 218, 225-26, 38 L. Ed. 2d 854, 862 (1973) (quoting *Columbe v. Connecticut*, 367 U.S. 568, 602, 6 L. Ed. 2d 1037, 1057-58 (1961)). Factors to be considered in this inquiry are whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant. *Jackson*, 308 N.C. at 582, 304 S.E.2d at 153. *See also Schneckcloth*, 412 U.S. at 226, 36 L. Ed. 2d at 862 (listing factors, including defendant's age and deprivation of food or sleep).

The trial court's findings of fact are binding if supported by competent evidence in the record. *State v. Rook*, 304 N.C. 201, 212, 283 S.E.2d 732, 740 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982). The conclusion of voluntariness, however, is a legal question which is fully reviewable. *State v. Davis*, 305 N.C. 400, 419, 290 S.E.2d 574, 586 (1982).

Applying these principles to the case at hand, we conclude that the trial court correctly concluded that defendant's confession was voluntary. The trial court found as fact that prior to the interview defendant was not arrested. He was given Miranda warnings, he understood those warnings, and he waived his rights. The interrogating officers wore civilian clothing, displayed no weapons, and the environment was not an intimidating one. Defendant was calm and in control of his faculties. He was told that he was free to leave. He had experience with the criminal justice system. He was thirty-five and had worked in responsible managerial positions in different businesses. These findings are supported by competent evidence in the record.

Other evidence elicited on voir dire also indicates that the confession was not coerced. Defendant stated that Crawford was cordial

during the interview and that he did not feel threatened. Further, the interview lasted thirty-six minutes. *See State v. Booker*, 306 N.C. 302, 310, 293 S.E.2d 78, 83 (1982) (five and one-half hour interview held not coercive).

We acknowledge that there are present in this case several facts which generally tend to support a finding of coercion. Crawford conceded that some of his statements to defendant were untrue, and the trial court found in accord with this testimony. We reiterate that we do not condone such tactics, but they alone do not establish coercion. *See Jackson*, 308 N.C. at 582, 304 S.E.2d at 152. Also, defendant for some time adamantly denied Crawford's accusations that he killed his wife. That alone, however, does not establish that his eventual confession was coerced.

Also, Crawford made several statements which defendant contends contained implicit promises or threats. Crawford stated, for example, "I want to know . . . why [you killed your wife], and that is important to you, because that has to do in the criminal system—that is going to have a lot to do with how you are treated and what happens to you. If you don't tell me the reason . . . then all we are going to look like [sic] is that you just went there and killed her," and "[I]f your side is not told, it's going to appear to be a lot worse than it looks."

We agree with defendant that these statements in isolation could be interpreted to contain implicit promises or threats; but viewed in context, and in light of defendant's voir dire testimony, they do not mandate a conclusion that defendant's statements were coerced. We first note that many of Crawford's statements were ambiguous; it was often not at all clear exactly what he was saying. Further, there were clearly times when Crawford was simply urging defendant to confess in order to ease his conscience. He stated, for example, "And you're going to feel better when you tell the whole thing and what led up to it," and, "It's going to be like a big weight has lifted off of you when you tell your side of it."

Moreover, defendant's voir dire testimony tends to belie the assertion that his confession was coerced. On voir dire he stated that he did not feel Crawford was threatening him, and he never stated that he interpreted Crawford's statements to mean that he would be treated better by the criminal justice system if he confessed. We believe defendant's testimony falls considerably short of establishing that defendant was led to believe that the criminal justice system

would treat him more favorably if he confessed to the murder of his wife.

Looking to the totality of the circumstances, we conclude that defendant's "independent will was not overcome, so as to induce a confession that he was not otherwise disposed to make, by mental or psychological coercion or pressure." *Jackson*, 308 N.C. at 582, 304 S.E.2d at 152-53.

II.

[2]   Defendant next argues that the trial court erred in denying his motion to suppress the clothes found near the home of Martin Spencer on the ground that the Miranda warnings given to defendant that morning had grown stale.[2]

The evidence showed that defendant was given Miranda warnings at 9:00 a.m. at the police station. At 10:00 a.m. defendant and officers left the police station in search of defendant's clothes, which he claimed to have thrown out of his vehicle. Around noon defendant told Crawford that his clothes were at the home of a friend, Martin Spencer. Police went to the home upon defendant's direction. Spencer took them to defendant's clothes, which Spencer had taken into the woods near his home.

A Miranda warning does not have unlimited efficacy. *State v. McZorn*, 288 N.C. 417, 433, 219 S.E.2d 201, 212 (1975), *vacated on other grounds*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976). Where the effect of a Miranda warning becomes diluted due to the passage of time, a second warning is required. *Id.* Any statement obtained as a result of a custodial interrogation requiring Miranda warnings in which those warnings were not given is inadmissible. *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966).

Physical evidence obtained as a result of a failure to give required Miranda warnings, however, need not be excluded. *State v. May*, 334 N.C. 609, 611-13, 434 S.E.2d 180, 181-82 (1993), *cert. denied*, —— U.S. ——, 127 L. Ed. 2d 661 (1994). Thus, even if the warnings had grown stale, defendant's argument would fail because he seeks to exclude physical evidence and not the statements given by him. We also note

---

2. Defendant also makes an argument relating to the voluntariness of his statement leading to the discovery of the clothes. This argument put forth by defendant in his brief, however, seems to depend on a finding in his favor on Issue I, which we have rejected. We therefore reject the argument relating to the voluntariness of the statement made to officers leading to the discovery of the clothes.

that defendant's argument fails because the record reveals that there was no interrogation of defendant which led to this discovery of evidence.[3]

## III.

**[3]** Defendant next argues that the trial court erred in denying his motion to suppress evidence which was obtained without a warrant.

After arriving at the restaurant officers discovered a pocketbook with hair on it that was later determined to be hair of the victim. Officers later witnessed defendant walking near his car looking in the window. He appeared to be nervous. The officers eventually approached the car and saw a bloody money bag in the bed of the station wagon. Hair and blood on the bag was later determined to be consistent with the victim's hair and blood. A search of the car also revealed a bloody sock. The officers did not have a warrant for any of these searches and seizures. Defendant, however, had signed a consent form stating:

> Knowing my lawful right to refuse to consent to such a search, I willingly give my permission to the above named officer(s) to conduct a complete search of the premises and property, including all buildings and vehicles, both inside and outside of the [restaurant]. The above said officer(s) further have my permission to take from my premises and property, any letters, papers, materials or other property or things which they desire as evidence for criminal prosecution in the case or cases under investigation.

The trial court found that the items seized were in plain view and that defendant consented to the searches and admitted the pocketbook, moneybag and sock into evidence.

---

3. The following occurred on cross-examination of Crawford:

Q.   Okay. At some point in time, did you question him and say that the clothes were not out there and you wanted him to tell the truth about where the clothes were?

A.   No, sir, as I previously testified, we—including the defendant—searched for the clothes for some period of time, and he made a statement to me that he had not told me the truth about where the clothes were.

Crawford also later said that "there was not an interrogation out on the road." The trial court found that defendant and Crawford "talked" and that the clothes were found as a result of "Crawford's conversation with defendant." Based on this record, we find that no interrogation occurred in any event so as to require re-Mirandization even if the original warnings had grown stale.

STATE v. HARDY

[339 N.C. 207 (1994)]

"[A] governmental search and seizure of property unaccompanied by prior judicial approval in the form of a warrant is per se unreasonable unless the search falls within a well-delineated exception to the warrant requirement." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 620 (1982). One such exception is the plain view doctrine. "It is well settled that evidence of crime falling in the plain view of an officer who has a right to be in a position to have that view is subject to seizure and may be introduced into evidence." *State v. Mitchell*, 300 N.C. 305, 309, 266 S.E.2d 605, 608 (1980), *cert. denied*, 449 U.S. 1085, 66 L. Ed. 2d 810 (1981). A warrant is not necessary for a search or seizure when the owner of the item seized consents to the search or seizure. *State v. Vestal*, 278 N.C. 561, 578-79, 180 S.E.2d 755, 767 (1971), *cert. denied*, 414 U.S. 874, 38 L. Ed. 2d 114 (1973). The burden is on the State to show that the consent was given without coercion, duress, or fraud. *Id.*

We find that the State has shown that the warrantless searches and seizures in the case at hand fall within both of these exceptions. The officers, being called to the scene of a dead body, were lawfully in the restaurant. While the record is not totally clear on the location of the pocketbook within the restaurant, it appears to have been found near the body on the floor. This is consistent with defendant's statement to officers that his wife was "slinging her purse." Thus, being in plain view, the seizure of the purse as evidence in a murder investigation was not unconstitutional. Similarly, the items in the car were in plain view since they were visible through the window. *See Texas v. Brown*, 460 U.S. 730, 744, 75 L. Ed. 2d 502, 515 (1983) (seizure of items from defendant's car not Fourth Amendment violation even though officer at license check had no warrant when he had probable cause to associate the item with criminal activity and the item was lawfully viewed by the officer).

Defendant's consent also obviated the need for a warrant. The trial court found as fact that prior to signing the form, defendant was advised that he did not have to consent to the search; defendant had a copy of the consent form while Crawford read it aloud to him; and defendant appeared to understand what he was doing. Defendant also restates his arguments in Issue I relating to involuntariness, but as we found in Issue I, defendant was not in a coercive environment and the actions taken by defendant were the product of his free will. Defendant emphasizes that he was not Mirandized at the time he gave consent, but Mirandization is not necessary prior to obtaining a consent to search. *See Vestal*, 278 N.C. at 579, 180 S.E.2d at 767.

Since the evidence seized was within plain view, and since defendant in any event consented to the searches and seizures, his assignment of error is overruled.

IV.

[4] Defendant next argues the trial court erred in admitting, over objection, portions of Karen Hardy's diary.

At trial the prosecutor called Karen's mother and asked her to read the 27 February 1992 entry in Karen's diary to the jury. Defendant objected on the grounds the diary was hearsay and any relevance was substantially outweighed by the prejudicial effect of the diary. The trial court overruled the objection and ruled the diary entry admissible under Rule 803 to show "the relationship of the parties."

The trial court then instructed the jury as follows:

Now, members of the jury, I do want to indicate that evidence of other actions may be included by the defendant in this exhibit. That evidence is not admissible to prove the character of the defendant in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, identity or absence of mistake, entrapment or accident.

The trial court gave no further instructions regarding the diary entry.

The diary entry for 27 February 1992 was read to the jury. It said:

Charlie went off this morning. He wanted to take his break and I said, 'Please, let's catch up the dishes first,' and he got mad. When we finished the dishes, he wouldn't leave. I said, 'Act immature, why don't you? Why don't you try acting like an adult male?' He hit me in the side of the head and slapped me across the face, then took off. He came back a little later, didn't apologize, wanted to use the vacuum. David changed the lock on my break. Late that night, he went off berserk, threw water, dishes, ashtrays, paper at me. Screamed he was going to kill me. Alan came to help mop and tried to hold him back. He jumped up in the car and broke the steering wheel adjuster. We filed a harassment charge. Waiting twenty-four hours.

We have had many occasions in recent times to consider whether a victim's out-of-court statements are admissible to show the victim's state of mind, and we are once again faced with this issue. We now

recede from some prior holdings and take this opportunity to clarify this area of law.

The State argues the diary entry was admissible since "defendant's violent conduct and threat toward his wife as shown by the exhibit were directly relevant to premeditation and deliberation and intent . . ." and since "the State may introduce evidence of violent conduct and threats by a husband against his wife in a trial of him for murdering her." The State also argues that the diary entry was admissible to show inferentially Karen's state of mind and her relationship with defendant. We deal with these arguments in turn.

In response to the State's argument that the diary entry is admissible to show defendant's violent conduct and his threat toward Karen, defendant argues that the State is attempting to prove the "truth of the matter asserted" in the diary entry and thus the diary entry is being used for a hearsay purpose.[4] *See* N.C. R. Evid. 801. Thus, the diary entry is inadmissible unless it is subject to a hearsay exception. N.C. R. Evid. 802.

The State in response refers to N.C. R. Evid. 803(3), which excepts from the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The State argues that the statements in the diary are "statement[s] of [Karen's] then existing state of mind" and that they are therefore not excluded by the hearsay rule. We cannot agree.

The statements in the diary are not statements of Karen's state of mind but are merely a recitation of facts which describe various events. This Court faced a similar issue in *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *judgment vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *in light of McKoy v. North Carolina*, 494 U.S. 433, 108

---

4. The State argues defendant has not preserved any error as to the admission of this evidence on hearsay grounds since defendant's assignment of error states only that the diary was "inadmissible, unauthenticated, and irrelevant." We believe, however, that in light of the centrality of the hearsay issue to the admissibility of this evidence, and considering that defendant sufficiently raised hearsay objections at trial, defendant has properly preserved any error relating to the diary being hearsay.

**STATE v. HARDY**

[339 N.C. 207 (1994)]

L. Ed. 2d 369 (1990). In *Artis* the trial court prevented defendant from introducing evidence showing the victim said she was going to be killed if "the people" ever caught up with her. *Id.* at 303, 384 S.E.2d at 484. Defendant argued on appeal that this hearsay evidence was admissible as a statement of the victim's state of mind. We disagreed, however, finding the statements to be merely a " 'statement of . . . belief to prove the fact . . . believed.' " *Id.* at 304, 384 S.E.2d at 484 (quoting Rule 803(3)). Statements of a declarant's state of mind, are, for example, "I'm frightened," or, "I'm angry." *See State v. Locklear,* 320 N.C. 754, 759-60, 360 S.E.2d 682, 685 (1987) (rape victim's statement that she was "scared" of defendant is statement of state of mind and thus excepted from hearsay rule). Karen's diary, however, contains no statements like these which assert her state of mind.

Our conclusion is bolstered by the policy behind the state-of-mind hearsay exception, which is that "there is a fair necessity, for lack of other better evidence, for resorting to a person's own contemporary statements of his mental or physical condition" and that such statements are more trustworthy than the declarant's in-court testimony. 6 John H. Wigmore, *Evidence* § 1714 (James H. Chadbourn rev. 1976). Mere statements of fact, however, are provable by other means and they are not inherently trustworthy. The case before us makes this point quite clearly. The facts in Karen's diary, which portray attacks upon her and a threat against her, were admissible through the testimony of other persons who witnessed these events. Also, the facts lack the trustworthiness of statements such as "I'm frightened" and amount to precisely the type of evidence the hearsay rule is designed to exclude.

We are further persuaded that these statements are not admissible under the state-of-mind hearsay exception on the ground the diary entry is at best speculative as to Karen's state of mind. The State seems to assert that the diary shows that Karen feared defendant, but the diary entry is conflicting on that point. While the diary entry describes two attacks by defendant upon Karen, and we could infer generally that one who is attacked will fear her attacker, there are also indications in the diary entry that Karen was not intimidated by defendant. The diary states that Karen asked defendant to wash the dishes at which time he became "mad." Karen then said to defendant, "Act immature, why don't you? Why don't you try acting like an adult male." These are not words we would ascribe to a woman fearful of a physical attack by her husband.

The entire entry in fact expresses no emotion and seems to have been written in a calm and detached manner. This further tends to

refute any inference that Karen's state of mind was one of fear. In a footnote the State says, "Her [Karen's] initiation of some legal proceeding helps reveal her mental condition and helps illuminate her relationship with defendant." The State fails, however, to clarify what that mental condition was or the nature of the relationship. To the extent the State is arguing that filing a "harassment charge" is an indication of fear, we must recognize that most battered wives do not report acts of violence out of fear of retaliation.[5] That Karen filed a harassment charge, therefore, may be some indication that Karen did not fear defendant. Thus, it is not at all clear what state of mind is supposedly demonstrated by the diary entry. *See State v. Walker*, 332 N.C. 520, 542, 422 S.E.2d 716, 729 (1992), *cert. denied*, —— U.S. ——, 124 L. Ed. 2d 271 (1993) (Webb, J., dissenting, joined by Exum, C.J., and Frye, J.) (victim's statements that defendant attacked her were inconclusive as to victim's state of mind).

Thus, we conclude the diary entry was not admissible under the state-of-mind hearsay exception.

**[5]** As stated earlier, the State also argues that the statements in the diary are admissible as tending to show a bad relationship between Karen and defendant. The State's argument seems to be that the diary entries were not offered to prove the truth of the statements themselves; rather they were offered to show merely that the victim made them. Simply by showing that the victim made such statements, the State argues, is indicative of a bad relationship between her and defendant. Under this argument the diary entry is not offered to "prove the truth of the matter asserted" and thus we are not presented with a hearsay problem. *See* N.C. R. Evid. 801(c); *see also State v. Holder*, 331 N.C. 462, 484, 418 S.E.2d 197, 209 (1992) (victim's statements that defendant had a gun and that defendant threatened her not hearsay when used to show merely that statements were made and when statements were coupled with a statement that the victim was "scared").

Even if evidence that such statements were made by Karen is relevant on the issue of her relationship with defendant to show that this relationship was bad, its admissibility is still subject to Rule 403 which requires its exclusion if its probative value is substantial-

---

5. *See, e.g., Planned Parenthood v. Casey*, —— U.S. —— , —— , 120 L. Ed. 2d 674, 723 (1992) (referring to district court's finding that "A battered woman, therefore, is highly unlikely to disclose the violence against her for fear of retaliation by the abuser" and stating that the findings are supported by numerous studies).

ly outweighed by the danger of unfair prejudice. *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990). We find in this case that the statements in the diary as they bear on Karen's relationship with defendant should have been excluded since any probative value they may have had was substantially outweighed by the danger of unfair prejudice.

To the extent that the diary statements are indicative of a bad relationship between the victim and the defendant, their probative value is substantially outweighed by the danger that the jury will make improper use of the statements. It would not be permissible for the jury to consider the statements as proof of the facts they declare; the jury would be restricted to considering simply the fact that the statements were made.

The evidence in this case showed that defendant assaulted his wife at the restaurant and caused her death. Defendant returned to Martin Spencer's home on the morning of 4 March 1992 with blood on his pants, and he admitted to Spencer that he killed his wife at the restaurant by cutting her jugular vein with a knife. Police found bloody money bags in defendant's station wagon and defendant later made a full confession to police in which he detailed how he met his wife at the restaurant that morning and killed her with a knife. There was no evidence, nor any contention, that defendant killed his wife in self-defense or that his wife committed suicide. Based on this presentation of evidence, the only real issue for the jury was the degree of homicide of which defendant was guilty.

Thus, the central issue in the case was defendant's state of mind at the time of the murder. The issue before us is the extent to which Karen's relationship with defendant was relevant on any issue in the case. The State asserts, without further elaboration, that this relationship, to the extent that it was bad, was "helpful in proving issues like defendant's ill will." After examining the arguments of the parties and considering the other evidence in the case, we conclude Karen's relationship with defendant bears so tangentially on the issue of defendant's state of mind that it cannot justify admission of the diary entry.

First, the diary entry does not clearly reflect a certain type of relationship between Karen and defendant. To the extent the State relies upon the assaults and threat contained in the diary to establish the relationship between Karen and defendant, it is using the diary entry

for the truth of the matter asserted, which we have already found to be an impermissible hearsay use of the diary.

To whatever minimal extent Karen's relationship with defendant is probative of defendant's state of mind, it is substantially out-weighed by the danger that the jury would misuse the diary entry, which sets forth two assaults by defendant upon Karen and a threat to take her life, as proof that defendant actually committed these acts. As stated by Justice Cardozo:

> It will not do to say that the jury might accept the [victim's] dec-larations for any light they cast upon [her state of mind], and reject them to the extent that they [incriminate the defendant with hearsay.] Discrimination so subtle is a feat beyond the com-pass of ordinary minds. . . . It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative con-venience, and practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out.

*Shepard v. United States*, 290 U.S. 96, 104, 78 L. Ed. 196, 201-02 (1933).

Having found that admission of the diary entry was error, we must next determine whether that error entitles defendant to a new trial. After reviewing the evidence against defendant, we find that there is no reasonable possibility that the admission of the diary entry affected the jury's verdict that defendant was guilty of first-degree murder. N.C.G.S. § 15A-1443(a) (1988).

The diary entry essentially described two assaults upon Karen Hardy and a threat to take her life. The latter of these assaults and the threat, however, were related to the jury through the testimony of John Davis who arrived at the restaurant on 27 February 1992 at 9:30 to 10:00 p.m., shortly before closing. Davis testified in detail about how he saw defendant "throwing things around such as ashtrays, paper pamphlets, newspaper, kitchen utensils"; he later explained that "[s]ometimes he was [throwing things] at Karen and then some-times it was anger—you know, it was just slamming stuff." Davis then testified that defendant said, "Karen, I will kill you, bitch." He pro-ceeded to explain that Karen went to her car but that it would not start. Davis then saw defendant banging on the car and attempting

unsuccessfully to enter the driver's side. Defendant then went to the back of the vehicle and managed to enter the vehicle. Davis testified that he "saw him beating on her" and that Karen tried to stop him by covering her head. Defendant then put his hands around Karen's neck, at which time Davis pulled defendant off Karen. Karen then drove off.

Thus, most of the diary entry was repetitive of Davis' testimony. In fact, Davis' testimony went far beyond the entry in the diary in terms of describing the assault upon Karen on the night of 27 February 1992 and the threat defendant made to Karen. The only harmful statement in the diary entry not contained in Davis' testimony was the statement that in the morning, "He hit me in the side of the head and slapped me across the face, then took off." It must also be noted, however, that Chad England testified to an attack upon Karen in January or February at the restaurant. In light of the more severe assault on the evening of 27 February 1992, which involved defendant throwing items at Karen, threatening to kill her, banging on her car in an attempt to enter it, beating her inside the car and eventually choking her, and in light of the weighty evidence against defendant, including his inculpatory statements to Martin Spencer and to the police, we find that there is no reasonable possibility that the admission of the diary entry affected the outcome of the trial. N.C.G.S. § 15A-1443(a); *State v. Austin*, 320 N.C. 276, 285, 357 S.E.2d 641, 646, *cert. denied*, 484 U.S. 916, 98 L. Ed. 2d 224 (1987) (admission of victim's statements harmless).

V.

**[6]** Defendant next argues that the trial court erred in giving the following instruction to the jury prior to the reading from Karen Hardy's diary:

> Now, members of the jury, I do want to indicate that evidence of other actions may be included by the defendant in this exhibit. That evidence is not admissible to prove the character of the defendant in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, identity or absence of mistake, entrapment or accident.

There were no other instructions given the jury regarding the diary entry. Thus, while the jury was instructed that it could not consider the evidence in the diary to prove the character of the defendant, it

was in effect instructed that it could consider the contents of the diary entry as substantive evidence for other purposes.

This instruction was error. As stated earlier, the statements in the diary were not admissible to establish the truth of the matters asserted therein. Even if Rule 403 did not require the exclusion of the diary entry, the attacks and the threat as described therein were admissible only to show Karen's state of mind. The evidence contained in the diary was not admissible to show defendant's character or anything else, such as motive or intent, beyond the extent to which those matters are shown by Karen's state of mind.

We find, however, that there is no reasonable possibility that this instruction affected the outcome. N.C.G.S. § 15A-1443(a). As discussed above in Issue IV, Alan Davis testified to the attack upon Karen in the restaurant on the night of 27 February 1992. He also testified to the threat defendant made to her and the assault which continued outside the restaurant. Since these statements were made at trial they are not hearsay; further, this evidence is relevant and admissible to show defendant's state of mind.

Evidence of other wrongs is admissible under Rule 404(b) depending on the similarity and temporal proximity of those wrongs to the crime charged. *State v. Artis*, 325 N.C. 278, 299, 384 S.E.2d 470, 481 (1989), *sentence vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *in light of McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). The evidence in this case, as introduced through Davis, of an assault by defendant on the victim within one week of her death is admissible to show malice. *See State v. Simpson*, 327 N.C. 178, 185, 393 S.E.2d 771, 775 (1990); *State v. Kyle*, 333 N.C. 687, 697, 430 S.E.2d 412, 417 (1993). Also, the threat defendant made to Karen, as testified to by Davis, was admissible and properly considered by the jury as evidence of defendant's intent. *State v. Syriani*, 333 N.C. 350, 376-77, 428 S.E.2d 118, 131-32, *cert. denied*, —— U.S. —— , 126 L. Ed. 2d 341 (1993), *reh'g denied*, —— U.S. —— , 126 L. Ed. 2d 707 (1994).

Thus, the jury could properly consider, through the testimony of Davis, the assault upon Karen on 27 February 1992 and the threat to her life as evidence of defendant's motive and intent. That the jury was instructed it could consider the assault and threat as evidence of defendant's motive and intent from the diary entry as well could have had no appreciable effect on the jury's determination of defendant's intent or motive. We also emphasize that Chad England testified to an incident in January or February of 1992 in which defendant attempt-

ed to strike Karen in the restaurant and that the evidence that defendant killed his wife was tremendous. In light of the testimony of Davis, which the jury properly could have considered as bearing on defendant's intent or motive, the testimony of England, and the other evidence of defendant's guilt, there is no reasonable possibility that the outcome was affected by the erroneous instruction.

## VI.

**[7]** Defendant next argues that the trial court erred in preventing him from impeaching Martin Spencer based on Spencer's marijuana use and poor memory.

A voir dire of Martin Spencer revealed that he was involved in a car wreck years earlier which affected his memory. Spencer also used marijuana regularly which affected his memory. The night before he testified he smoked two marijuana cigarettes. There was no testimony specifically showing that he was unable to remember the pertinent events of 3 March 1992 or 4 March 1992 about which he testified.

Later on cross-examination of Martin Spencer, before the jury, defense counsel asked, "Okay, sir, and you're a drug user, aren't you?" The State objected, which was sustained. Defense counsel then asked, "On the day of—that you're testifying to, did you smoke marijuana?" The State again objected and asked to be heard outside the presence of the jury. The court never ruled on this objection on the record. The parties and the judge then left the courtroom and an unrecorded proceeding was conducted.

When they returned to the courtroom, and outside the presence of the jury, the prosecutor said:

> Just—just so I can get it straight in my mind, you are going to allow questions as to—as to Mr. Spencer smoking marijuana on March the 3rd and March the 4th, if it is asked by the defendant. I guess my inquiry is at this point, are you—is the Court—not you. Is the Court going to allow questions as to any smoking marijuana over extended period of time, even though that's not—that question has not been asked.

The trial court responded:

> I have difficulty ruling in advance on questions and speculating on what might be asked or what might not be asked. I did say that I would be inclined, if the defense counsel wanted to go into that area, to allow him to ask those questions about marijuana

smoking on the night of—on the night of March 3rd but I further indicated the concern—well, I won't go—go into detail but I did indicate that I would allow him to get into that line of questioning if he chose to do so and asked him to make a determination as to whether he chose to do so.

Upon resuming cross-examination of Spencer in the presence of the jury, defense counsel asked no questions relating to Spencer's drug use.

We conclude that, based on this record, defendant was not in fact precluded from asking Spencer about his marijuana use. The statements of the prosecutor and the court recited above indicate that the court ruled that it would permit the defendant to ask Spencer about his marijuana use. The trial court could not have been clearer when it stated, "I did indicate that I would allow him to get into that line of questioning if he chose to do so . . . ." If there was error in sustaining the State's initial objections, it was cured by the later ruling of the trial court permitting inquiry into Spencer's marijuana use. Defendant chose to not ask about Spencer's marijuana use, and he cannot complain of that decision now. Defendant's assignment of error is therefore overruled.

VII.

[8] Finally, defendant argues that the trial court erred in denying his motion to dismiss the first-degree murder charge on the ground that there is insufficient evidence of premeditation and deliberation.

"On a motion to dismiss on the ground of insufficiency of the evidence, the question for the court is whether there is substantial evidence of each element of the crime charged." *State v. Bates,* 309 N.C. 528, 533, 308 S.E.2d 258, 262 (1983). Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *State v. Patterson,* 335 N.C. 437, 449-50, 439 S.E.2d 578, 585 (1994). The evidence in this inquiry must be viewed in the light most favorable to the State and the State is to receive every reasonable inference that can be drawn from the evidence. *Id.* at 450, 439 S.E.2d at 585.

Premeditation requires an intent to kill that was formed some time, however short, before the murder; deliberation requires an intent to kill that was formed in a cool state of blood. *Id.* at 450, 439 S.E.2d at 586. As premeditation and deliberation are not ordinarily provable by direct evidence, they are often established with circum-

stantial evidence. *Id.* at 450, 439 S.E.2d at 586. Premeditation and deliberation can be inferred from the conduct and statements of the defendant before and after the killing. *Id.* at 451, 439 S.E.2d at 586.

In this case, there was evidence of a history of domestic difficulties between the defendant and the victim. Defendant had been seen striking his wife on two occasions and on one of those occasions he said, "Karen, I will kill you, bitch." The physical evidence showed that defendant stabbed the victim several times to her chest, neck, head and hands. She had several defensive wounds and died of loss of blood caused by the severing of her carotid arteries.

After killing his wife, defendant tried to make the murder appear to be connected with a robbery. He then returned to Martin Spencer's home where he ordered Spencer to burn his clothes; he remained at Spencer's until he saw Spencer burn what defendant believed to be his clothes. He later confessed to police that he went to the restaurant that morning where he left the lights off and waited for his wife to arrive. After his wife arrived they began arguing and his wife called him a homosexual, at which time "it just snapped." Defendant got a knife from the kitchen, held his wife down, and stabbed her.

We find that this evidence, viewed in the light most favorable to the State, is sufficient to support a conviction for first-degree murder. The threat defendant made to kill his wife within one week of the murder is strong evidence that defendant premeditated the murder of his wife. His actions in arriving at the restaurant, keeping the lights off and awaiting the arrival of his wife also tend to indicate premeditation. Further, the manner in which he obtained a knife, held his wife down, and inflicted numerous stab wounds shows an intent to kill formed before the murder.

Much of the evidence stated above is also probative to show that defendant killed his wife in a cool state of blood. Defendant's actions after the killing, however, especially indicate that he deliberated the killing of his wife. He immediately attempted to make the killing seem connected to a robbery, and he soon attempted to destroy incriminating evidence. He returned to the restaurant where he feigned shock upon finding the fate of his wife and concocted an alibi which he repeatedly told the police. This evidence all shows that defendant was in full control of his faculties immediately following the murder. This, in turn, is some evidence that he murdered his wife in a cool state of blood.

Since there was substantial evidence of premeditation and deliberation, defendant's assignment of error is overruled.

For the foregoing reasons, we hold that defendant received a fair trial, free of prejudicial error.

NO ERROR.