NO. COA14-258

NORTH CAROLINA COURT OF APPEALS

Filed: 21 October 2014

STATE OF NORTH CAROLINA

   v.

ANTOINETTE NICOLE DAVIS

Cumberland County
No. 11 CRS 009135

Appeal by defendant from judgment entered 18 October 2013 by Judge James Floyd Ammons, Jr. in Cumberland County Superior Court. Heard in the Court of Appeals 27 August 2014.

*Attorney General Roy Cooper, by Assistant Attorney General Kathleen N. Bolton, for the State.*

*Amanda S. Zimmer for defendant-appellant.*

HUNTER, Robert C., Judge.

Antoinette Nicole Davis ("defendant") appeals from judgment entered pursuant to her *Alford* plea to two counts of felonious child abuse and one count each of second degree murder, human trafficking, conspiracy to commit sexual offense of a child by an adult offender, first degree kidnapping, first degree sexual offense, sexual servitude, and taking indecent liberties with a minor. On appeal, defendant challenges the trial court's denial of her motion to suppress incriminating statements made to law

enforcement personnel during interviews conducted in November 2009. Specifically, defendant argues that the trial court erred by concluding that: (1) defendant was not subject to custodial interrogation during these interviews, and (2) her confession was voluntarily and understandingly made.

After careful review, we affirm the trial court's denial of defendant's motion to suppress.

## Background

From 10 November 2009 through 14 November 2009, defendant was interviewed four times by law enforcement personnel at the Fayetteville City Police Department. She went to the police department voluntarily for each of the four interviews, with the stated purpose of helping the officers find her missing five-year-old daughter, S.D.[1]

### A. The First Interview

On 10 November 2009, defendant called 911 to report that S.D. was missing. She went to the police station and spoke with Detective Tracey Bowman ("Detective Bowman"). The first interview began at 8:54 a.m. and lasted approximately six hours and nine minutes. Defendant was left alone in the interview room for long periods of time, with the door closed but

---

[1] To protect the privacy of the minor victim, we will refer to her using her initials.

unlocked. Detective Bowman told defendant that she was keeping the door closed as a safety precaution because criminal suspects were inside the building. Defendant was allowed to take bathroom and cigarette breaks, but was accompanied by Detective Bowman during each. Detective Bowman explained that a Police Department safety code required that she escort defendant. Defendant was offered beverages several times throughout the interview and was given food to eat.

In the first interview, defendant told Detective Bowman that she did not know what happened to S.D. or who could have taken her. At the time, defendant and S.D. were living in a trailer with defendant's sister, Brenda. Defendant claimed to have put S.D. to sleep in S.D.'s brother's bedroom at around 5:00 a.m. that morning, and that at around 6:00 a.m., S.D.'s brother told defendant that S.D. was no longer in the bed with him. When defendant discovered that no one in the trailer had seen S.D., she searched the front part of her neighborhood then called the police.

Towards the end of the interview, defendant expressed frustration at being at the police station for so long, because she wanted to be out looking for S.D. Detective Bowman told her she could leave if she really wanted to, but defendant declined.

Defendant left the station approximately six hours after arriving.

### B. The Second Interview

The second interview began at 5:25 p.m. on 11 November 2009 and lasted approximately thirty minutes. During this interview, defendant told Detective Bowman that her boyfriend, Clarance Coe ("Coe"), had taken S.D. She claimed that he hit S.D. twice in the face in the early morning hours of 10 November 2009 after having an intense argument with defendant. Although defendant claimed that she tried to stop him, Coe "took off" in a car with S.D. Defendant told Detective Bowman that she believed S.D. to be somewhere around the Murchison Road area. After taking defendant's statement, Detective Bowman checked to see if there were any new developments in the case. Soon thereafter, defendant left the station.

### C. The Third Interview

The third interview began at 8:38 p.m. on 12 November 2009 and lasted approximately forty-six minutes. Detective Bowman initiated the interview by telling defendant that she knew defendant had been lying about what happened to S.D. Detective Bowman yelled and cursed at defendant, repeatedly accusing her of lying. Defendant began to cry. Detective Bowman showed

defendant a photograph of S.D. with Mario McNeil, also known as "Mono," and asked defendant what she thought Mono would say when he was caught. Defendant then admitted that she had lied the previous day and that Coe had nothing to do with S.D.'s disappearance. Detective Bowman told defendant that her false statements lead to Coe's arrest and incarceration and that lying to a federal agent is a federal offense punishable by up to five years in prison.

During the interview, Detective Bowman left the room and closed the door as a safety precaution due to other prisoners being in the building. Defendant asked for and received a glass of water, at which time Detective Bowman told defendant that they needed to work together to get S.D. back safely. Defendant told Detective Bowman that Mono had a relationship with defendant's sister, Brenda. Defendant was then allowed to take a bathroom break and was left alone in the interview room. Before defendant left the police station, Detective Bowman told her that she did not know what would happen as a result of defendant's lies, and that "[a]ll we care about right now is finding your daughter." Defendant thanked Detective Bowman and left the police station.

**D. The Fourth Interview**

The fourth and final interview began at 11:53 a.m. on 14 November 2009 and lasted approximately five hours and thirty minutes. Rather than speaking with Detective Bowman, defendant was interviewed by Detective Carolyn Pollard ("Detective Pollard") and Sergeant Chris Corcione ("Sgt. Corcione"). Defendant was seated in the back corner of the interview room, with Detective Pollard and Sgt. Corcione between her chair and the door. After approximately two hours of discussing defendant's personal background, defendant indicated that her stomach hurt. She told the officers that she was pregnant. Detective Pollard suggested that defendant go to the Health Department for an examination, but defendant refused and said "[m]y next step is to finish trying to find my daughter."

Defendant then began recounting the events surrounding S.D.'s disappearance. She awoke on the morning of 10 November 2009 to find S.D. gone. Defendant asked her sister's boyfriend if anyone had been in the house, and he replied "Mono." However, defendant claimed that she did not see or hear anyone in the house and reiterated that she had nothing to do with S.D.'s disappearance. Defendant admitted to Detective Pollard and Sgt. Corcione that she lied in previous interviews and "put it all on [Coe]." However, defendant said that she lied because

Detective Bowman scared her and "tried to make her know something she didn't know." Detective Pollard asked defendant if she was scaring her, and defendant said that she was not. Defendant then said that she wanted to tell the truth after she learned that Coe had been arrested because of her previous lies.

Sgt. Corcione told defendant that he wanted her to tell the truth, because Mono was in jail and had already informed the police that defendant knew what happened to S.D. The officers told defendant that they already knew what happened but that they needed to hear it from her; they repeatedly asked defendant to stay on the "right track" by telling the truth. Defendant told the officers that Mono came to the trailer because he wanted to have sex with her. Sgt. Corcione advised defendant to stay on the right track, and said that no matter what she said she would "walk out of here."

Eventually, defendant said that she owed Mono $200.00, and that he wanted either the money that was owed or sex to repay the debt. Sgt. Corcione told defendant that Mono was going to tell the truth to save himself, so she needed to be entirely truthful about what happened next. He told defendant "I got to hear it from you so we can put that monster away." Defendant emotionally confessed to the officers that Mono took S.D. to a

motel room with defendant's consent with the understanding that "[a]ll he was supposed to do was have sex with her." She said that this arrangement would settle her $200.00 debt. Defendant then claimed that the plan was for Mono to take S.D. to a motel for another individual to have sex with her, but she did not know whom the third party was. After giving these statements to the officers, defendant requested and was allowed to take a cigarette break.

When she returned, defendant was asked for details regarding the arrangement she had with Mono. Defendant denied knowing the specifics of Mono's plan for S.D. Defendant was then left in the interview room alone. She asked Sgt. Corcione how much longer she was going to be there, to which he responded "[n]ot too much longer." Defendant took another bathroom and cigarette break and asked Detective Pollard to join her outside. After returning, defendant took one more bathroom break, then was left alone in the interview room for approximately thirty minutes. Detective Bowman then entered the room and advised defendant that she was under arrest and was no longer free to leave.

On 16 November 2009, S.D.'s body was found on the side of Walker Road outside of Fayetteville. Medical examiners

concluded that S.D.'s cause of death was asphyxiation. Blood was found on anal and vaginal swabs, indicating sexual trauma.

Defendant was charged with human trafficking, felonious child abuse, felony conspiracy, first degree kidnapping, first degree murder, rape of a child by an adult offender, sexual servitude, and taking indecent liberties with a child. She filed a motion to suppress the incriminating statements made to Detective Pollard and Sgt. Corcione during the fourth interview, but did not move to suppress any statements made in the other three interviews. After hearing the parties on defendant's motion to suppress, the trial court entered an order denying the motion.

In exchange for dismissal of the rape charge and a reduction from first to second degree murder, defendant entered an *Alford* plea on 18 October 2013. Pursuant to the plea agreement, she was sentenced to 210 to 261 months imprisonment.

Defendant timely appealed from judgment, but failed to give notice during plea negotiations as to her intent to appeal the denial of her motion to suppress. *See* N.C. Gen. Stat. § 15A-979 (2013). Furthermore, defendant's notice of appeal failed to identify the specific court to which the appeal was taken, in violation of Rule 4 of the North Carolina Rules of Appellate

Procedure. In our discretion, we grant defendant's petition for writ of certiorari to reach the merits of her appeal. *See* N.C. R. App. P. 21(a)(1) (2013); *State v. Franklin*, __ N.C. App. __, __, 736 S.E.2d 218, 220 (2012).

## Discussion

## I. Custodial Interrogation

Defendant first argues that the trial court failed to address whether a reasonable person in defendant's position would have believed she was under arrest or restrained to a significant degree, and therefore erred by concluding that defendant was not subject to custodial interrogation during the fourth interview. We disagree.

We review the trial court's legal conclusions in an order denying a motion to suppress *de novo*. *State v. Parker*, 137 N.C. App. 590, 594, 530 S.E.2d 297, 300 (2000). We also review the legal conclusions for whether they are supported by the trial court's findings of fact. *State v. Waring*, 364 N.C. 443, 467, 701 S.E.2d 615, 631 (2010). "[A] trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *Id.* at 469, 701 S.E.2d at 632 (citation omitted). Unchallenged findings of fact are deemed supported by competent evidence and are binding on

appeal. *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011).

The Fifth Amendment to the United States Constitution guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amemd. V. The United States Supreme Court has held that the Fifth Amendment bars statements resulting from custodial interrogation from being used against a defendant unless the defendant was administered certain procedural safeguards before responding, specifically being advised of the "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney[.]" *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07 (1966).

However, the Court has emphasized that

> Police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

*Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977) (per curiam).

The "definitive inquiry" in determining whether a person is "in custody" for *Miranda* purposes is whether, based on the totality of the circumstances, there was a "formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405 (1997) (citing *Stansbury v. California*, 511 U.S. 318, 128 L.Ed.2d 293 (1994) (per curiam)). This determination involves "an objective test, based upon a reasonable person standard, and is to be applied on a case-by-case basis considering all the facts and circumstances." *State v. Hall*, 131 N.C. App. 427, 432, 508 S.E.2d 8, 12 (1998) (quotation marks omitted). While "no single factor controls the determination of whether an individual is 'in custody' for purposes of *Miranda*[,]" *State v. Garcia*, 358 N.C. 382, 397, 597 S.E.2d 724, 737 (2004), our appellate courts have "considered such factors as whether a suspect is told he or she is free to leave, whether the suspect is handcuffed, whether the suspect is in the presence of uniformed officers, and the nature of any security around the suspect," *State v. Waring*, 364 N.C. 443, 471, 701 S.E.2d 615, 633 (2010) (internal citations omitted).

Defendant argues that the trial court's conclusion of law that she was not subject to custodial interrogation during the

fourth interview is erroneous for two reasons: (1) the trial court used a subjective rather than objective test, in contravention of long-standing precedent, and (2) the trial court's findings of fact are unsupported by competent evidence, and those findings in turn do not support the conclusion that a reasonable person in defendant's position would not have felt constrained to the same degree as with a formal arrest. We disagree with both contentions.

First, there is no indication that the trial court utilized a subjective rather than objective test in its conclusions of law regarding whether defendant was subject to custodial interrogation. The trial court concluded that:

> The Defendant was not subjected to custodial interrogation during the interviews of November 10, 2009, November 11, 2009, November 12, 2009 and November 14, 2009 until about 5:25 p.m. on November 14, 2009 when Det. Bowman told her that she was under arrest. *The Defendant was not in custody until that point in time because the Defendant had not been formally arrested or otherwise deprived of her freedom of movement of the degree associated with a formal arrest until that moment.*

(Emphasis added.) This conclusion of law tracks verbatim language found in applicable opinions issued by this Court and our Supreme Court regarding the test for whether an individual was subject to custodial interrogation. *See State v. Buchanan*,

353 N.C. 332, 339, 543 S.E.2d 823, 828 (2001) ("[T]he appropriate inquiry in determining whether a defendant is 'in custody' for purposes of *Miranda* is, based on the totality of the circumstances, whether there was a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'") Although the trial court did find as fact that defendant believed she was free to leave at various points of the interview, it also entered numerous findings of fact detailing the objective circumstances of the interview. There is no indication that the trial court supported its conclusion that defendant was not subject to custodial interrogation with the finding of fact that she subjectively felt free to leave; that finding of fact could have properly been considered in the trial court's conclusion regarding the voluntariness of her confession.

Thus, because the trial court's conclusion that defendant was not subject to custodial interrogation makes no reference to defendant's subjective state of mind, but does determine the "appropriate inquiry" as set out in *Buchanan*, we conclude that the trial court did not operate under a misapprehension of law. Defendant's argument is overruled.

Additionally, we hold that the trial court's findings of fact are supported by competent evidence, and those findings support its conclusion of law that defendant was not subject to custodial interrogation.

First, the trial court's finding of fact that defendant was not threatened is supported by competent evidence. Although defendant was told by Detective Bowman in the third interview that lying to a federal officer was punishable by up to five years in prison, neither Detective Pollard nor Sgt. Corcione threatened her with arrest or imprisonment during the fourth interview. Rather, Detective Pollard and Sgt. Corcione told defendant that they were unconcerned with the potential consequences of her previous lies and wanted to get to the truth of what happened so that they could find S.D. Because the only interview subject to defendant's motion to dismiss was the fourth interview, Detective Bowman's prior statements to defendant do not render the trial court's finding of fact that defendant was not threatened erroneous.

Second, competent evidence supports the trial court's finding of fact that defendant was not restrained during the fourth interview. Defendant concedes that she was not handcuffed or physically restrained in any way. However,

defendant contends that her freedom of movement was restricted to the degree associated with a formal arrest because she was seated in the corner of the interview room and was "crowded" by Detective Pollard and Sgt. Corcione, who were seated on either side of defendant, between her and the door. Although we do not dispute defendant's characterization of the seating arrangement inside the interview room, we do not find that these circumstances amounted to a "restraint" on her mobility. Defendant requested and was allowed to take multiple bathroom and cigarette breaks throughout each of the four interviews. Although she was escorted by an officer for each of these breaks, our Supreme Court has noted that it is "unlikely that any civilian would be allowed to stray through a police station," indicating an unwillingness to consider a police escort for a bathroom break as weighing in favor of a contention that a defendant was in custody. *Waring*, 364 N.C. at 472, 701 S.E.2d at 634. During the fourth interview, Detective Pollard even suggested that defendant leave and go to a medical center when defendant indicated that she felt pain and stomach illness due to her pregnancy. Defendant declined to leave; she elected to continue speaking to the officers with the hope that they would help her find S.D. Thus, because the record demonstrates

that defendant could have left the fourth interview had she desired to do so and generally had the freedom to take breaks whenever she requested them, competent evidence supports the trial court's finding of fact that defendant's freedom of movement was not restrained.

Given that competent evidence supports the trial court's factual findings that defendant was neither threatened nor restrained during the fourth interview, we find no error in its legal conclusion that defendant was not in custody for the purposes of *Miranda*. In addition to the above, we find competent evidence to support the trial court's findings of fact that: (1) defendant voluntarily went to the police station for each of the four interviews; (2) she was allowed to leave at the end of the first three interviews; (3) the interview room door was closed but unlocked; (4) defendant was allowed to take multiple bathroom and cigarette breaks; (5) defendant was given food and drink; and (6) defendant was offered the opportunity to leave the fourth interview but refused. Our Courts have consistently held that similar circumstances do not amount to the level of custodial interrogation. *See, e.g., State v. Gaines*, 345 N.C. 647, 658-63, 483 S.E.2d 396, 402-06 (1997) (holding that a defendant was not in custody where he

voluntarily went to the police station, was not told that he was under arrest, was interviewed in a room at the police station but was not handcuffed, was offered food, and the officer did not answer him when he asked if he could leave); *State v. Deese*, 136 N.C. App. 413, 417-18, 524 S.E.2d 381, 384-85 (2000) (holding that a defendant was not in custody where he was permitted to arrange the interview at a time convenient to him, was told that he was free to leave, was not physically threatened or restrained, and was left alone in the interview room for periods of time); *State v. Waring*, 364 N.C. 443, 471, 701 S.E.2d 615, 633-34 (2010) (holding that the defendant was not in custody where officers told him he was not under arrest, he voluntarily went with officers to the police station, was never restrained, was given bathroom breaks, was left alone in an unlocked interview room, and was not deceived, misled, or threatened).

We conclude that under the totality of the circumstances, a reasonable person in defendant's position would not have believed that she was formally arrested or restrained to the degree associated with a formal arrest at the time defendant gave incriminating statements during the fourth interview.

Therefore, we affirm the trial court's conclusion that defendant was not subject to custodial interrogation.

## II. Voluntariness of Confession

Defendant next argues that the trial court erred by concluding that her statements made in the fourth interview were freely and voluntarily given, when in fact they were coerced by fear and hope. We disagree.

The Fourteenth Amendment to the United States Constitution requires that a defendant's confession be voluntary for it to be admissible. *State v. Thompson*, 149 N.C. App. 276, 281, 560 S.E.2d 568, 572 (2002). "If, looking to the totality of the circumstances, the confession is the product of an essentially free and unconstrained choice by its maker, then he has willed to confess and it may be used against him; where, however, his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994) (quotations and brackets omitted). Our Supreme Court has identified a number of relevant factors to consider in this analysis, such as:

> whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the

> interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.

*Id.* However, "[t]he presence or absence of any one or more of these factors is not determinative." *State v. Kemmerlin*, 356 N.C. 446, 458, 573 S.E.2d 870, 881 (2002).

Here, defendant argues that she was coerced into confessing because: (1) Sgt. Corcione promised her that she would "walk out" of the fourth interview regardless of what she said,; (2) the officers lied to her about what information Mono had given them; and (3) she was mentally unstable and unfit to give a voluntary confession due to the stress of having a missing child, being pregnant, and being implicated in S.D.'s disappearance.

First, we do not believe that Sgt. Corcione's promise that defendant would "walk out" regardless of her statements rendered defendant's confession involuntary. This argument was previously addressed in *Thompson*, where the defendant argued that his confession was involuntary where the interviewing officer promised him that he would not be arrested regardless of what he said. *Thompson*, 149 N.C. App. at 282, 560 S.E.2d at 572. This Court held that the officer's promise did not make

the confession involuntary because it could not have led the defendant "to believe that the criminal justice system would treat him more favorably if he confessed to the robbery." *Id.* at 282, 560 S.E.2d at 573. In so holding, the Court contrasted previous cases where officers' promises of assistance or leniency in future prosecutions were held to be unduly coercive. *See, e.g.*, *State v. Fox*, 274 N.C. 277, 293, 163 S.E.2d 492, 503 (1968) (holding that a suggestion that the defendant might be charged with accessory to murder rather than murder if he confessed rendered the confession involuntary). Sgt. Corcione's statements are almost identical to those made in *Thompson*. Thus, in accordance with *Thompson*, we hold that Sgt. Corcione's promise that defendant would "walk out" of the interview regardless of what she said did not render her confession involuntary. Without more, Sgt. Corcione's statements could not have led defendant to believe that she would be treated more favorably by the criminal justice system if she confessed to her involvement in S.D.'s disappearance and subsequent death.

Second, there is no indication that the officers lied about what information Mono provided. No evidence was presented at the suppression hearing regarding what Mono told law enforcement, and there is nothing to support defendant's claim

that Detective Pollard and Sgt. Corcione lied to defendant about the information Mono provided.  However, even assuming that the officers were untruthful, the longstanding rule in this state is that "[t]he use of trickery by police officers in dealing with defendants is not illegal as a matter of law."  *State v. Jackson*, 308 N.C. 549, 574, 304 S.E.2d 134, 148 (1983).  Specifically, our Supreme Court has held that "[f]alse statements by officers concerning evidence, as contrasted with threats and promises, have been tolerated in confession cases generally, because such statements do not affect the reliability of the confession."  *Id.*  Thus, because there is no indication that Sgt. Corcione or Detective Pollard lied to defendant regarding the information Mono provided law enforcement, we find her argument unpersuasive.  Even assuming that they did lie, this interrogation tactic would not "affect the reliability of the confession," *id.*, and therefore would still be insufficient to support a conclusion that the confession was coerced or involuntary.

Finally, we do not believe that defendant's mental state rendered her confession involuntary and coerced.  Although defendant did tell Detective Pollard and Sgt. Corcione that she had not slept in five days due to the stress of S.D. being

missing, the trial court found as an uncontested finding of fact that defendant "appeared to be coherent, did not appear to be impaired in any way, . . . appeared to understand what was being said during the interview[,]" and "the majority of her answers were reasonable and were being taken in relationship to the question." Detective Pollard offered defendant the opportunity to stop the interview and go to the Health Department, but defendant declined, indicating that her "next step" would be to help the officers find S.D.

In sum, nearly all of the relevant factors identified by the *Hardy* Court weigh in favor of the State. As discussed above, defendant was not in custody when she made incriminating statements to Detective Pollard and Sgt. Corcione, and therefore, her *Miranda* rights were not implicated. *See Buchanan*, 353 N.C. at 337, 543 S.E.2d at 827. Furthermore, competent evidence supports the trial court's findings of fact that defendant was neither threatened with prosecution for lying nor physically restrained during the fourth interview. She was not held incommunicado, as demonstrated by the fact that she was able to access her cell phone multiple times during the fourth interview. She was offered water and food in addition to being allowed to take bathroom or cigarette breaks whenever she

requested them. There were no threats of force or shows of violence used against her. She was a competent, literate, twenty-five-year-old woman who clearly understood the English language and responded clearly and reasonably to the questions asked. When given the opportunity to leave the fourth interview, she chose to stay in an effort to help the officers find her missing daughter.

Given the totality of these circumstances, we hold that defendant's confession was "the product of an essentially free and unconstrained choice by its maker," *Hardy*, 339 N.C. at 222, 451 S.E.2d at 608, and we affirm the trial court's conclusion of law that defendant's statements "were not the product of hope or induced by fear."

## Conclusion

For the foregoing reasons, we affirm the trial court's denial of defendant's motion to suppress.


AFFIRMED.

Judges DILLON and DAVIS concur.