IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-700

No. COA20-402

Filed 21 December 2021

Durham County, No. 15 CRS 50153

STATE OF NORTH CAROLINA

v.

CHAN TAVARES THOMAS, Defendant.

Appeal by defendant from judgment entered on or about 6 March 2019 by Judge Michael J. O'Foghludha in Superior Court, Durham County. Heard in the Court of Appeals 13 April 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General L. Michael Dodd, for the State.*

*Joseph P. Lattimore, for defendant.*

STROUD, Chief Judge.

¶ 1 Defendant Chan Tavares Thomas appeals from a judgment entered following a jury trial finding him guilty of first degree murder, discharging a firearm into an occupied vehicle in operation inflicting serious bodily injury, and six counts of discharging a firearm into an occupied vehicle in operation. Defendant makes six arguments on appeal, of which three are plain error arguments, relating to hearsay exceptions, expert testimony, lay opinion testimony, and relevancy. Defendant also

argues cumulative error. We find no error on four issues, no plain error on the remaining two issues because they did not prejudice Defendant, and no cumulative error.

## I. Background

The State's evidence tended to show that on the evening of 2 December 2014, the victim, Kenneth Covington, and Demesha Warren, who had a long-term, on-again, off-again, non-exclusive sexual relationship with Defendant, were watching television together at Warren's apartment in Durham. Warren and Covington were friends from work, and while Warren denied they were in a romantic relationship, Warren's best friend from the time described Warren and Covington's relationship as romantic. Regardless of the true nature of the relationship, Defendant was jealous of Covington's relationship with Warren. For example, in August 2014, Defendant attacked Warren because of her relationship with Covington, and, upon seeing Covington and Warren driving around together one day, Defendant threatened to kill them if he ever saw them together again. As a result of those threats, Covington feared Defendant.

At one point during the night of 2 December, Covington took Warren's car to go to the store. Defendant somehow learned that someone else was driving Warren's car, and he came to her apartment to confront her about it. Warren refused to open her door for Defendant and told him from her patio to leave her alone. At that point,

Defendant left Warren's apartment in his car, a gray or silver Acura. Warren tried to call Covington to tell him Defendant was in the neighborhood but could not reach him.

¶ 4    After Covington left the store and as he was driving back to Warren's apartment, a car later identified as Defendant's pulled alongside the car Covington was driving. Defendant then shot at Covington's car multiple times with a .40 caliber gun. Following the shooting, the car Covington was in crashed about a block down the road, and a bystander found Covington unresponsive with bullet wounds. When EMS arrived at the scene, they pronounced Covington dead due to a gunshot wound in his left ribcage. At trial, the forensic pathologist who performed the autopsy confirmed that gunshot wound killed Covington.

¶ 5    The police, specifically Investigator James Barr, determined the car Covington was found in belonged to Warren and went to her apartment from the crime scene. Barr interviewed Warren and recorded that interview on a small digital recorder he carried. During the interview, Warren told Barr that Defendant had previously attacked her because of her relationship with Covington and Defendant had visited her apartment earlier that night. After the interview, Warren had her best friend at the time pick her up so that Warren could eventually go stay with her family in Fayetteville. When her friend picked her up, Warren told the friend, "that bastard killed him," which the friend took to mean that Defendant had killed Covington.

¶ 6         In addition to her interview with Barr the night of the murder, Warren provided a written statement to Barr a few days later at Barr's request. She spoke to a family member who transcribed her statement in an email. When Warren experienced technical problems sending the email, she eventually had a family member drive her to Durham where she handed the printed-out email to Barr in person and signed and dated it. The email statement recounted Warren's interactions with Defendant and Covington the day of the murder, including most pertinently that she watched television with Covington in the evening, Covington took her car to the store, and the interaction where Defendant asked Warren who was driving her car.

¶ 7         After concluding the interview with Warren the night of the shooting, Barr and other officers went to Defendant's residence. Upon arriving, Barr noticed Defendant's car, a gray or silver Acura with a sunroof, and based on his experience from past DWI cases, he felt under the hood and determined the car was still warm, indicating it had recently been driven. Barr then interviewed Defendant. Defendant told Barr he had been working that night and had gone to see a woman—other than Warren—but that he was home by 12:30am, before the shooting and car crash happened around 12:40am. Defendant did not initially mention he had gone to Warren's apartment, but when confronted by Barr with that information, Defendant admitted he had stopped by Warren's apartment, claiming the stop was related to concert tickets.

Defendant also denied any involvement in Covington's murder and even denied knowing Covington. But Defendant admitted he knew what kind of car Warren drove. Defendant also admitted that he was the only one who drove the Acura that was out front and that he was the only one using that car the night of the murder.

¶ 8        During and following the interview, Defendant allowed the police to collect forensic evidence. First, he volunteered the clothes he wore the night of the murder. Defendant also consented to a gunshot residue ("GSR") test on his hands and car. The GSR collection expert collected the GSR kits from Defendant's hands and car at about 6am in the morning. The collection expert also filled out a standard GSR analysis information form based on Defendant's answers; Defendant said he had not fired a gun recently or been in close proximity to a gun that was fired, had not washed his hands recently, and had been asleep for the past four to six hours before collection. The State's GSR expert testified at trial that the kit revealed characteristic GSR particles on Defendant's left hand and in his vehicle.

¶ 9        When Barr received the GSR results in early January 2015, he obtained an arrest warrant on the murder charge. Defendant refused to meet at the police headquarters, so Barr arranged to meet with Defendant at a gas station about an unrelated matter with the goal of arresting him for the murder without incident. Upon discovering Barr had a murder warrant, Defendant fled and evaded police in the ensuring pursuit. About a week later, officers in Burlington, North Carolina saw

Defendant in their jurisdiction and arrested him without incident. When the police recovered Defendant's car, they searched it and found a .45 caliber bullet that did not match the weapon used in the murder of Covington. Defendant was charged with one count of first degree murder, one count of discharging a firearm into an occupied vehicle in operation inflicting serious bodily injury, and six counts of discharging a firearm into an occupied vehicle in operation.

¶ 10          At trial, the State presented this evidence along with additional evidence of Defendant's jail phone calls with Warren in which Defendant repeatedly blamed Warren for implicating him in the murder. Defendant and the State also clashed on a few issues at trial. First, because Warren testified that she could not remember in detail the events at issue due to trauma-induced memory loss from Covington's murder, the death of family members, losing her job, and being separated from her son, the State sought to introduce her prior statements to Barr, both the interview and the email statement, as well as her past statement to her friend implicating Defendant in Covington's murder. While Defendant did not object to the statement Warren made to her friend, Defendant objected to Warren's past statements to Barr on the grounds that Warren did not remember making them. The State responded by asking the prior statements to Barr be read into evidence pursuant to Rule of Evidence 803(5) for past recorded recollection and Rule 804(b)(1) for former testimony

because the statements were admitted at a prior trial.[1] The trial court ruled the past statements were admissible under Rule 803(5) because Warren had testified it was her statement, made while matters were fresh in her mind, that she could no longer remember because of the trauma and because she testified she told Barr everything that happened to her on that night.

¶ 11 Defendant also objected to the State presenting the GSR evidence, leading the trial court to hold a full GSR hearing. Defendant's motion, filed by former counsel, was based upon multiple grounds, including the State Crime Lab's failure to follow its own protocol in testing a GSR kit from Defendant as it was collected more than four hours after the shooting and the State Crime Lab's failure to establish the threshold levels of each GSR particle element. At the hearing, Defendant argued only the failure to follow protocol by collecting the GSR kit more than four hours after the shooting. After hearing from Barr, the GSR collection expert, the GSR expert, and an outside expert, the trial court ultimately ruled the GSR evidence was admissible. As relevant to the four-hour-protocol issue, the trial court found the State Crime Lab's protocol, as testified to by the GSR expert, requires evidence of incapacity on the GSR kit information form to test kits collected more than four hours after the shooting.

---

[1] Defendant was previously tried on these charges, and that case resulted in a hung jury. As we more fully address below, the trial court clarified it did not rely on the former testimony hearsay exception, so the prior trial has no impact on this appeal from the retrial.

The trial court found that evidence existed here because, as recorded on the form Defendant stated he had been sleeping at the relevant time. The trial court also found that the State Crime Lab's policy sought to avoid fruitless searches because more time between the shooting and collection makes it less likely GSR evidence will be found; as a result, finding GSR on Defendant's hands was more probative rather than less given the delay.

¶ 12    Finally, as relevant to the issues on appeal, Defendant objected to Barr's testimony about the color and features of the car in surveillance videos of the shooting and whether the car belonged to Defendant. Aside from sustaining the objection to a description of the car's color for one black-and-white video, the trial court overruled all Defendant's objections without additional explanation.

¶ 13    Defendant did not offer any evidence at trial. The jury convicted Defendant of all eight counts. Defendant was sentenced to life imprisonment without parole for the first degree murder charge and to 83 to 112 months total on the seven discharging weapons counts. Pursuant to his notice of appeal in open court, Defendant appeals.

## II.    Witness Statements Admitted as Past Recorded Recollections

¶ 14    Defendant first argues the trial court erred in admitting two of Warren's past statements—one recorded by Barr the night of Covington's murder and the other an email Warren later wrote to Barr—via North Carolina General Statute § 8C-1, Rule 803(5) because the State failed to meet the Rule's requirement that "the statements

correctly reflected Warren's prior knowledge of the matters discussed." (Capitalization altered). Specifically, Defendant argues the State could not establish the accuracy of the statements "due to Ms. Warren's lack of memory about what she said." Defendant then argues he was prejudiced by the statements coming into evidence because without them, "there is a 'reasonable possibility' of a not guilty verdict." (Citing N.C. Gen. Stat. § 15A-1443(a) (2019).)

¶ 15 The State argues the statements were admitted not just under Rule 803(5), which concerns past recorded recollections, but also under Rule 804(b)(1), which covers prior testimony. N.C. Gen. Stat. § 8C-1, Rules 803(5) and 804(b)(1) (2019). The State's argument has two flaws. First, even assuming without deciding that Warren was unavailable as required by Rule 804(b), the statements would not be admissible under Rule 804(b)(1). N.C. Gen. Stat. § 8C-1, Rule 804(b). By its plain language, Rule 804(b)(1) only reaches "[t]estimony given as a witness at another hearing of the same or a different proceeding." *Id.* While the recording and email were apparently admitted at a prior trial, the State did not try to admit the past testimony from that prior trial. Rather the State sought to admit and later had read into the record the actual recording and email. Because the underlying statements, not the past testimony, were introduced and played for or read to the jury, Rule 804(b)(1) would not apply here.

¶ 16 Even if the Rule applied here, it is not clear we could even consider this

alternative ground for admitting the past statements. The State argues the second potential grounds for admission is relevant because "[t]he burden is on the defendant to show that there was no proper purpose for which the evidence could be admitted." In making that argument, the State relies on *State v. Moseley*, 338 N.C. 1, 32, 449 S.E.2d 412, 431 (1994). However, the portion of *Moseley* the State cites is about Rule 404(b) specifically. *See id.* The burden is on the defendant to show no proper purpose only in the 404(b) context because "[t]he list of purposes in the second sentence of subsection (b) of Rule 404 is neither exclusive nor exhaustive." *Id.* Thus, we only analyze the basis of admission upon which the trial court relied. Here, while the trial court initially discussed Rule 804(b)(1)[2] as well, it clarified twice that the statements were admitted under Rule 803(5). Thus, we limit our analysis to Rule 803(5).

## A. Standard of Review

¶ 17 "[A]dmission of evidence alleged to be hearsay is reviewed *de novo* when preserved by an objection." *State v. Harris*, 253 N.C. App. 322, 327, 800 S.E.2d 676, 680 (2017) (citing *State v. Wilson*, 197 N.C. App. 154, 159, 676 S.E.2d 512, 515 (2009)); *see also Wilson*, 197 N.C. App. at 159, 676 S.E.2d at 515 ("We review *de novo* the trial court's determination of whether an out-of-court statement is admissible pursuant

---

[2] The trial court says "803(1)" but this appears to have been a misstatement because the trial court discussed testimony at a prior trial, which is relevant to 804(b)(1). N.C. Gen. Stat. § 8C-1, Rule 804(b)(1).

to" Rule 803.). Defendant objected to the introduction of both the recording and the email on hearsay grounds. Thus, we review admission of both documents *de novo*, *i.e.* "as if we were considering the issue for the first time." *State v. Brown*, 258 N.C. App. 58, 68, 811 S.E.2d 224, 231 (2018).

**B. Analysis**

Rule 803(5) provides that a type of out-of-court statement labeled "recorded recollection" is admissible as an exception to the general rule against hearsay. N.C. Gen. Stat. § 8C-1, Rule 803(5) (capitalization altered). While the Rule speaks of a "memorandum or record," the word record is broadly construed to include both audio and video recordings. *Wilson*, 197 N.C. App. at 160, 676 S.E.2d at 516 (holding "an audio recording can be admissible as a 'record' under Rule 803(5)"); *Harris*, 253 N.C. App. at 325–26, 800 S.E.2d at 679–80 (ruling a video interview of the State's witness by law enforcement "was properly introduced pursuant to Rule 803(5)"). "The rule applies in an instance where a witness is unable to remember the events which were recorded, but the witness recalls having made the entry at a time when the fact was fresh in her memory, and the witness knew she recorded it correctly." *Brown*, 258 N.C. App. at 68, 811 S.E.2d at 231 (quotations and citation omitted).

In prior cases, we have broken down Rule 803(5) into three foundational requirements. *Id.*, 258 N.C. App. at 68, 811 S.E.2d at 230–31 (citing N.C. Gen. Stat. § 8C-1, Rule 803(5)). Rule 803(5) permits a memorandum or record to be read into

evidence where:

> (1) the witness once had knowledge about the matters he recorded, (2) the witness now has insufficient recollection to enable him to testify fully and accurately about those matters, and (3) the record was made or adopted by the witness at a time when the matters were fresh in his memory and reflected his knowledge correctly. N.C. Gen. Stat. § 8C-1, Rule 803(5).

*Brown*, 258 N.C. App. at 68, 811 S.E.2d at 230–31.

¶ 20 Here, the dispute centers on the third foundational requirement, specifically whether the records reflected Warren's knowledge correctly. Only that foundational requirement can be challenged based on the record before us. Warren once had knowledge about the matters recorded in both the video recording and the email statement because they involved events in her life concerning Defendant and the murder victim. Further, Warren did not at the time of trial have sufficient recollection that enabled her to testify fully and accurately about the matters in the statements. While Warren could remember speaking with Barr and giving him a statement at his urging, she could not remember the contents of either the conversation or the statement due to trauma-induced memory loss.

¶ 21 The caselaw on whether the record correctly reflected the witness's knowledge at the time involves the far sides of the spectrum. On the one end, this Court has ruled the record did not correctly reflect the witness's knowledge at the time where the witness disagreed with or disavowed their prior statements on the stand. *See*

*Wilson*, 197 N.C. App. at 160–61, 676 S.E.2d at 516 (witness testified anything she said was "not going to be credible because really my mental state, I [was] liable to say anything) (emphasis removed); *State v. Spinks*, 136 N.C. App. 153, 159, 523 S.E.2d 129, 133 (1999) (witness "disagree[d] with some of the statements found" in the prior recorded statement); *State v. Hollingsworth*, 78 N.C. App. 578, 581, 337 S.E.2d 674, 676–77 (1985) (witness testified the whole past recorded statement was "a lie. I lied . . . ."). One of those cases even involved a tape-recorded statement, leading this Court to clarify that the mere fact a statement is recorded is not enough to meet the requirement the statements contained therein reflected the witness's knowledge accurately at the time. *Wilson*, 197 N.C. App. at 161, 676 S.E.2d at 516.

¶ 22      On the other end of the spectrum, this Court has ruled that the record accurately reflected the witness's knowledge at the time when the person testified they recorded all the information they had at the time. *Brown*, 258 N.C. App. at 69–70, 811 S.E.2d at 231–32; *see State v. Leggett*, 135 N.C. App. 168, 173, 519 S.E.2d 328, 332 (1999) (ruling the foundational requirement was met when witnesses testified their past statements were accurate). This Court has ruled similarly when the witness had the chance to review the statement at the time and edit it as necessary, "thereby adopting it." *State v. Love*, 156 N.C. App. 309, 315, 576 S.E.2d 709, 712–13

(2003) (footnote omitted);[3] *see also Leggett*, 135 N.C. App. at 173, 519 S.E.2d at 332 (ruling the requirements of Rule 803(5) were satisfied when the witness "did recall reviewing and correcting the statement that the detective took from him, thereby adopting it.").

¶ 23 Unlike prior cases, this case involves a set of facts in the middle of the spectrum. Warren did not testify the statements were correct at the time, but she likewise did not disavow the statements on the stand. As to the recording, Warren testified she knew it was her voice in the recording, even if she did not know at the time she was being recorded. Warren also testified initially that she "was pretty much just ranting" before then stating she was "more so talking to Investigator Barr like he was my best friend, like he just needed to know what I had been through or something, I don't know." While Defendant seizes on the "just ranting" testimony, the testimony is not a direct disavowal of Warren's previous statement as seen in the cases where we have held Rule 803(5)'s requirements were not met. Looking to the continuation of Warren's answer, the reference to "ranting" appears to refer to Warren's emotional state rather than the truthfulness of her statement. She affirmatively stated at the end of this question that she was telling Barr "what I had

---

[3] This case found no abuse of discretion on those facts, rather than reviewing the issue *de novo*. *Love*, 156 N.C. App. at 315, 576 S.E.2d at 713. Our use of *de novo* review is based on more recent caselaw cited in the standard of review subsection above.

been through" and agreed that she was "just laying it all out." Absent any direct statements indicating she was lying, we conclude that in telling Barr what she had been through and in "laying it all out," Warren was relaying information that "reflected [her] knowledge correctly." *Brown*, 258 N.C. App. at 68, 811 S.E.2d at 231.

¶ 24      Turning to the email statement, we reach a similar conclusion. As with the recording, Warren did not disavow the statement, but she also did not testify it accurately reflected her knowledge at the time. Warren "was talking to a family member and telling them and because they knew that Investigator Barr needed it, that's what happened." Based on that testimony, it appears Warren dictated the statement to a family member. In the past, this Court has allowed statements written by others to come in as a witness's statement when the witness had a chance to review the statement. *See Love*, 156 N.C. App. at 315, 576 S.E.2d at 713; *Leggett*, 135 N.C. App. at 173, 519 S.E.2d at 332. While Warren did not expressly testify she reviewed the statement, she signed and dated the statement when she handed it to Barr and confirmed it was her handwriting. This Court previously considered signing and dating a statement, albeit one written by the witness, to support a finding that the written statement correctly reflected the witness's prior knowledge. *See Brown*, 258 N.C. App. at 69–70, 811 S.E.2d at 231–32. While again this is a close call, we conclude that the State presented enough information about the email statement to show Warren was relaying information that correctly reflected her knowledge. *See*

*id.*, 258 N.C. App. at 68, 811 S.E.2d at 231.

After *de novo* review, we find no error in admitting either of Warren's prior statements under Rule 803(5) because there is enough evidence for us to conclude Warren's past statements correctly reflected her knowledge at the time.

### III.    Gunshot Residue Expert Testimony

Defendant next argues the trial court erred in admitting evidence from the State's gunshot residue ("GSR") expert's analysis because "the State failed to meet its burden of establishing the reliability of the analysis." Defendant contends the GSR expert's analysis was not reliable in two different ways.

First, Defendant alleges the expert failed to follow his own laboratory's protocols "regarding the time between the alleged discharge of a firearm and the swabbing of persons/ objects for testing." In making that argument, Defendant relies heavily on *State v. Corbett*, 269 N.C. App. 509, 839 S.E.2d 361 (2020), *aff'd* 376 N.C. 799, 2021-NCSC-18[4], where this Court agreed with the defendant's argument that an expert was unreliable if he failed to follow his own admitted reliability standards. Defendant here cites to the expert's testimony that the lab's policy was not to analyze a kit if more than four hours had passed since a shooting, except in the case of

---

[4] Because the dissent in this Court focused on whether the defendant had preserved the issue about the reliability of the expert's testimony, the Supreme Court addressed only that topic. *Corbett*, ¶¶ 52–53. Therefore, the substantive analysis of this Court still stands.

incapacitation, including sleeping, or death. Defendant then states the GSR expert analyzed the swabs despite their collection five hours and forty-one minutes after the shooting because Defendant was allegedly sleeping. Defendant argues the trial court erred because "there was other evidence indicating that [Defendant's] activities would not meet the definition of death or other incapacitation," but the expert failed to follow protocol and performed the GSR analysis anyways. Ultimately, according to Defendant, that failure to follow protocol means the expert's opinion, as in *Corbett*, "was 'based upon insufficient facts and data, and accordingly, could not have been the product of reliable principles and methods applied reliably to the facts of this case.'" (Citing *Corbett*, [269 N.C. App. at 558, 839 S.E.2d at 398].)

¶ 28        Defendant also argues the expert failed to follow his lab's protocols regarding "the threshold amount values of barium, antimony, and lead," *i.e.* the GSR particles. Defendant indicates the State's expert and the trial judge did not address the topic, even though it was in Defendant's motion, and thus "the State failed to meet its burden of establishing the reliability of the analysis."

¶ 29        Defendant argues the alleged errors prejudiced him because "this error affected the live issue of whether [Defendant] was the person who gunned down Mr. Covington." Defendant further argues prejudicial error is more likely on an expert issue because "of the heightened credence juries tend to give scientific evidence." (Quoting *State v. Helms*, 348 N.C. 578, 582–83, 504 S.E.2d 293, 295–96 (1998).)

## A. Standard of Review

"A trial court's ruling as to the admissibility of proffered expert testimony will not be reversed on appeal absent a showing of abuse of discretion." *Corbett*, ¶ 51 (citations and quotations omitted). "[A] trial court may be reversed for abuse of discretion only upon a showing that its ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016) (citing *State v. Riddick*, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986)).

## B. Analysis

Under Rule 702(a), expert testimony must satisfy three tests to be admissible:

> First, the area of proposed testimony must be based on "scientific, technical or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue."
> . . . .
> Second, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education."
> . . . .
> Third, the testimony must meet the three-pronged reliability test that is new to the amended rule: "(1) The testimony [must be] based upon sufficient facts or data. (2) The testimony [must be] the product of reliable principles and methods. (3) The witness [must have] applied the principles and methods reliably to the facts of the case."

*McGrady*, 368 N.C. at 889–90, 787 S.E.2d at 8–9 (quoting N.C. Gen. Stat. § 8C-1, Rule 702(a) (2019)) (brackets in original). "In other words, North Carolina's Rule 702(a)

now incorporates the standard from the *Daubert* line of cases." *Id.*, 368 N.C. at 888, 787 S.E.2d at 8 (referencing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993)). Defendant's arguments here focus only on the third requirement, reliability.

¶ 32 While the reliability test has three specific components drawn from the text of Rule 702(a), N.C. Gen. Stat. § 8C-1, Rule 702(a)(1)–(3), "[t]he precise nature of the reliability inquiry will vary from case to case depending on the nature of the proposed testimony. In each case, the trial court has discretion in determining how to address the three prongs of the reliability test." *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152–53, 119 S. Ct. 1167 (1999)).

> The primary focus of the inquiry is on the reliability of the witness's principles and methodology not on the conclusions that they generate. However, conclusions and methodology are not entirely distinct from one another, and when a trial court concludes that there is simply too great an analytical gap between the data and the opinion proffered, the court is not required to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.

*Id.* (quotations, citations, and alterations omitted).

¶ 33 Our Supreme Court has given guidance on how the trial court *may* test reliability:

> Many previous cases, both federal and state, articulate particular factors that may indicate whether or not expert testimony is reliable.

> . . . .
> In the context of scientific testimony, *Daubert* articulated
> five factors from a nonexhaustive list that can have a
> bearing on reliability: (1) "whether a theory or technique .
> . . can be (and has been) tested"; (2) "whether the theory or
> technique has been subjected to peer review and
> publication"; (3) the theory or technique's "known or
> potential rate of error"; (4) "the existence and maintenance
> of standards controlling the technique's operation"; and (5)
> whether the theory or technique has achieved "general
> acceptance" in its field. *Daubert*, 509 U.S. at 593–94, 113
> S.Ct. 2786.
> . . . .
> . . . . In some cases, one or more of the factors that we listed
> in *Howerton* may be useful as well. *See Howerton* [*v. Arai
> Helmet, Ltd.*], 358 N.C. [440,] 460, 597 S.E.2d [674,] 687
> (listing four factors: use of established techniques, expert's
> professional background in the field, use of visual aids to
> help the jury evaluate the expert's opinions, and
> independent research conducted by the expert).

*McGrady*, 368 N.C. at 890–91, 787 S.E.2d at 9–10. Ultimately, the trial court has

discretion "to consider any of the particular factors articulated in previous cases, or

other factors it may identify, that are reasonable measures" to test the three

reliability prongs in Rule 702(a)(1)–(3). *Id.*, 368 N.C. at 892, 787 S.E.2d at 10.

Applying those legal principles, we address each of Defendant's two allegations

that the State's GSR expert failed to follow his lab's protocol in turn.

### 1. *Four-Hour Protocol*

Defendant first argues the trial court erred in admitting the State GSR expert's

testimony on reliability grounds because he failed to follow his lab's protocols

regarding testing material collected more than four hours after a shooting. Defendant relies heavily on this Court's opinion in *Corbett* that held the trial court abused its discretion in admitting expert testimony where the expert failed to follow the method he testified was appropriate when conducting blood pattern analysis. *See id.*, 269 N.C. App. at 554–55, 558, 839 S.E.2d at 396–98. This Court also explained, "noncompliance with the reliability standards and protocol prescribed in one's own treatise is inherently suspect . . . ." *Id.*, 269 N.C. App. at 555, 839 S.E.2d at 396. Defendant analogizes that case to the alleged failure of the State's expert to follow his lab's policies around not testing if there are delays in collecting GSR evidence after a shooting, except in certain circumstances, here.

¶ 36        Defendant reads *Corbett* correctly. A trial court abuses its discretion in finding an expert reliable when the expert fails to follow the protocols she testifies are appropriate. *Id.*, 269 N.C. App. at 554–55, 558, 839 S.E.2d at 396–98; *see also McGrady*, 368 N.C. at 898–99, 787 S.E.2d at 14–15 (finding no abuse of discretion when the trial court excluded an expert's proffered testimony because the expert acknowledged variables that could affect his opinions but then did not consider one of those factors in arriving at his conclusion in the case). However, Defendant's argument fails because that is not the situation the trial court faced here.

¶ 37        The State's GSR expert testified during voir dire that the State Crime Lab, his employer, has a technical procedure that if more than four hours elapsed between the

time of the shooting and time of collection of the GSR kit, the Lab will not examine

the kit. But there is an exception to that rule, which allows the kit to be examined if

the person from whom the evidence was collected was incapacitated or deceased

during the time between the shooting and the collection. The Lab defines

incapacitation as "[a]nything that limits mobility," including sleep. Under

questioning by the trial court, the expert clarified that the technical procedure directs

GSR analysts to test the kit if information on the GSR analysis information form,

which is collected by the person who administers the kit, indicates evidence of

incapacitation:

> Q. Okay. Protocol of the lab is if more than four hours have
> elapsed from the time of shooting to the time of testing on
> a living active person, it will not be tested.
> A. Can I read it from the technical procedure?
> Q. Yeah.
> A. One moment, please. GSR collection kits –
> Q. Go slower.
> A. Gunshot residue collection kits that meet one or more of
> the following criteria shall not be examined and a report
> shall be generated. One of those reasons is the gunshot
> residue analysis information form revealed that a time
> greater than four hours had elapsed between discharge of
> firearm and collection of gunshot residue hand kit. And
> then underneath it says, this does not apply to gunshot
> residue hand kits collected from incapacitated or deceased
> subjects.
> Q. Okay. So if -- to put it in sort of plain English, *if on the
> form itself there is evidence of incapacitated, and it's more
> than four hours, you will test the kit?*
> A. *That's correct.*

(Emphasis added.) The GSR expert explained that as a result, he has to "go by the information that's given to me regarding how to proceed." In other words, the State Crime Lab's technical procedure allows an analyst to test a kit collected greater than four hours after a shooting if the analyst is given information that the person from whom the evidence was collected was incapacitated.

¶ 38 Turning to Defendant's GSR kit and the expert applying that procedure, the GSR information form indicated that five hours and forty-one minutes elapsed between the time of the shooting and the time the GSR kit was collected. Thus, under the State Crime Lab's procedures, the GSR kit should not have been analyzed absent a showing of, *inter alia*, incapacitation based on the information on the GSR information form. Defendant told the person collecting the GSR kit from him that he had been sleeping, and the person collecting the kit wrote that on the GSR information form, thereby providing such evidence of incapacitation. As a result, the State's GSR expert followed the policies of the State Crime Lab in analyzing the kit.

¶ 39 In making its ruling, the trial court relied on the same facts in finding that the GSR expert did not violate the State Crime Lab protocol. In particular, the trial court found:

> Now as to what the -- what the protocol of the State Crime Lab, the Court finds that the protocol of the State Crime Lab in 2014 was that gunshot residue testing should not be conducted after four hours of an alleged shooting unless there was evidence of incapacity or someone being

> deceased.
>
> The Court finds that -- that the protocol was that if there was evidence of incapacity, then the kit could be examined. And in this case, according to the form which was filled out, there was evidence of incapacity from [Defendant], namely that between the time that he had come home at 12:30 and the time that he'd been woken up that he'd been sleeping.

The trial court further explained that the purpose of the State Crime Lab's protocol is to avoid "fruitless searches" because the longer time between the shooting and collection, the less likely it becomes any analysis will find GSR due to dissipation. Thus, the trial court concluded finding GSR on Defendant's hands was more probative rather than less probative given the delay. The trial court's analysis aligns with our own review of the testimony, so its ruling was not manifestly unsupported by reason and therefore was not an abuse of discretion.

¶ 40        Defendant's argument to the contrary fails because it does not appreciate the nuance of the State Crime Lab's procedure. Defendant argues "there was other evidence indicating that [Defendant's] activities would not meet the definition of death or other incapacitation." The State Crime Lab's procedure does not consider other evidence; as the trial court explained, it only considers evidence on the GSR information form. By following the information from the form, the expert followed State Crime Lab policy as required for the evidence to be reliable and thereby admissible. *See McGrady*, 368 N.C. at 890, 787 S.E.2d at 9; *Corbett*, 269 N.C. App.

at 554–55, 558, 839 S.E.2d at 396–98. If Defendant wanted to bring up the other evidence showing he was not sleeping as he told the GSR collection expert, he could have challenged the reliability of the test results by other means. *See State v. Griffin*, 268 N.C. App. 96, 108, 834 S.E.2d 435, 442 (2019) ("We note that 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking admissible evidence. [Citation] These conventional devices, rather than wholesale exclusion are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.'" (alterations from original excluded) (citing *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786)).

¶ 41 We find the trial court did not abuse its discretion in admitting the testimony of the State's GSR expert because he followed the State Crime Lab's procedures as required to meet Rule 702(a)'s reliability requirement.

## 2. *Threshold Amounts of GSR Elements*

¶ 42 Defendant also argues the trial court abused its discretion in admitting testimony from the State's GSR expert because the expert "never established that the data satisfied the additional protocol requirement of threshold levels of the elements" that make up GSR. Defendant included this ground for objecting to the State's GSR expert in his initial motion in limine, but Defendant did not include it when summarizing the motion during voir dire of the expert. After the second time

Defendant summarized the motion, the trial court asked if the basic grounds of the motion were, "essentially that as far as the hands go that was outside the protocol of the state crime lab, which is four hours[?]" Defendant's attorney responded, "Yes, sir, that's exactly right." Based on this sequence of events, while Defendant raised the threshold levels issue in his motion, he did not present this issue to the trial court at the hearing. As a result, it is unsurprising that the trial court never ruled on the threshold levels issue.

¶ 43    The Appellate Rules require a party to preserve issues for appeal by presenting a request, and "[i]t is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion." N.C. R. App. P. 10(a)(1). Rule 10(a)(1)'s requirement to obtain a ruling extends to situations where the party had multiple grounds in its initial motion but only got a ruling on one. *See State v. Warren*, 244 N.C. App. 134, 148–49, 780 S.E.2d 835, 844–45 (2015) (holding defendant failed to preserve an argument for appeal as to two witnesses when his motion to continue was based on three witnesses but he only got a ruling as to one witness and failed to ask for a ruling on the other witnesses). Thus, because Defendant failed to obtain a ruling from the trial court on his threshold levels issue, the issue is not preserved for our review under Rule 10(a)(1).

### IV. Lay Opinion Testimony about Car Color

¶ 44 Defendant's third argument is that the trial court erred by allowing Investigator Barr "to give lay opinions about the color and other features [a sunroof] of one of the cars depicted in video footage" of the shooting at issue. (Capitalization altered.) In making this argument, Defendant relies heavily on *State v. Belk* and *State v. Buie*. *Belk*, 201 N.C. App. 412, 689 S.E.2d 439 (2009); *Buie*, 194 N.C. App. 725, 671 S.E.2d 351 (2009). Defendant relies on *Belk* to argue a lay witness can only give an opinion about the contents of a video when there is a rational basis for concluding the witness is more likely than the jury to correctly identify what was shown. Defendant then cites *Buie* as an example of a case where the trial court impermissibly allowed a lay witness to narrate a surveillance tape because the police officer did not have firsthand knowledge of what the video depicted. Defendant contends this case is just like *Buie* because Barr did not observe the events depicted in the video. Defendant argues it was therefore error to "permit Investigator Barr to give his opinions about what he was observing on the videos." Defendant finally argues the error prejudiced him, especially because jurors give "significant weight" to opinion testimony from police officers. (Citing *Belk*, 201 N.C. App. at 418, 689 S.E.2d at 443.)

#### A. Standard of Review

¶ 45 We review the trial court's decision to admit lay opinion testimony for abuse of

discretion. *See State v. Williams*, 363 N.C. 689, 701, 686 S.E.2d 493, 501 (2009) (applying the abuse of discretion standard when the defendant argued testimony was "inadmissible lay opinion testimony"); *see also Belk*, 201 N.C. App. at 417, 689 S.E.2d at 442 ("We review a trial court's ruling on the admissibility of lay opinion testimony for abuse of discretion.").

## B. Analysis

¶ 46 "Ordinarily, opinion evidence of a non-expert witness is inadmissible because it tends to invade the province of the jury." *State v. Fulton*, 299 N.C. 491, 494, 263 S.E.2d 608, 610 (1980). That general rule exists because "the jury is charged with determining what inferences and conclusions are warranted by the evidence." *Buie*, 194 N.C. App. at 730, 671 S.E.2d at 354 (citing *State v. Peterson*, 225 N.C. 540, 543, 35 S.E.2d 645, 646 (1945), *overruled in part on other grounds by State v. Hill*, 236 N.C. 704, 73 S.E.2d 894 (1953)). North Carolina Rule of Evidence 701 carves out an exception for lay opinion testimony that "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2019). As Defendant correctly identifies, *Buie* and *Belk* are the leading cases on lay opinion testimony related to events depicted in a video.

¶ 47 In *Buie*, this Court reviewed a police officer's narration of surveillance tapes and opinion on what the tapes showed. 194 N.C. App. at 730, 671 S.E.2d at 354. This

Court recognized:

> The current national trend is to allow lay opinion testimony identifying the person, usually a criminal defendant, in a photograph or videotape where such testimony is based on the perceptions and knowledge of the witness, the testimony would be helpful to the jury in the jury's fact-finding function rather than invasive of that function, and the helpfulness outweighs the possible prejudice to the defendant from admission of the testimony.

*Id.* (citation and quotations omitted). The *Buie* court then determined based on past case law that lay opinion testimony about what video depicts is only admissible "when their [the witnesses'] interpretations were based in part on firsthand observations." 194 N.C. App. at 732, 671 S.E.2d at 356.

¶ 48   To support that conclusion, the *Buie* court relied on two cases, *State v. Mewborn* and *State v. Thorne*. *Mewborn*, 131 N.C. App. 495, 507 S.E.2d 906 (1998); *Thorne*, 173 N.C. App. 393, 618 S.E.2d 790 (2005). As recounted by the *Buie* court, the lay opinion testimony in *Mewborn* was admissible because the officer testified markings on the perpetrator's shoes in the video were very similar to markings on the defendant's shoes the officer had seen when the defendant was questioned by police. *Buie*, 194 N.C. App. at 732, 671 S.E.2d at 356 (citing *Mewborn*, 131 N.C. App. at 499, 507 S.E.2d at 909). Similarly, in *Thorne*, this Court upheld the admission of a police officer's opinion that the perpetrator's "gait" in a "lost surveillance video" was similar to the defendant's gait based on the officer's past observation of the

defendant's gait. *Id.*, 194 N.C. App. at 733, 671 S.E.2d at 356 (citing *Thorne*, 173 N.C. App. at 399, 618 S.E.2d at 795). Thus, *Buie*'s firsthand knowledge requirement allows a witness to have firsthand knowledge of the person being identified; it does not require the witness to have observed firsthand the events depicted in the video. *Id.*

¶ 49 Based on those legal rules, the *Buie* court concluded that the police officer's testimony had been admitted in error. *Id.* The police officer did not base his testimony "on any firsthand knowledge or perception" but instead testified based exclusively on his viewing of the video. *Id.* This Court emphasized that the officer "was not offering his interpretation of the similarities between evidence he had the opportunity to examine firsthand and a videotape" but instead opined that the actions in the video aligned with another witness's testified-to "recollection" of the crime. *Id.*

¶ 50 In *Belk*, this Court provided trial courts additional guidance on lay opinion testimony and videos by laying out several factors the courts can consider. 201 N.C. App. at 415–16, 689 S.E.2d at 441–42. Specifically, courts are to consider:

> (1) the witness's general level of familiarity with the defendant's appearance; (2) the witness's familiarity with the defendant's appearance at the time the surveillance photograph was taken or when the defendant was dressed in a manner similar to the individual depicted in the photograph; (3) whether the defendant had disguised his appearance at the time of the offense; and (4) whether the defendant had altered his appearance prior to trial.
> . . . .
> . . . [as well as (5)] the clarity of the surveillance image and completeness with which the subject is depicted . . . .

*Id.* (quotations and citations omitted). Ultimately, a reviewing court must uphold the admission of "lay opinion testimony if there was a rational basis for concluding that [the witness] was more likely than the jury correctly to identify [the d]efendant as the individual in the" video. *Id.*, 201 N.C. App. at 417, 689 S.E.2d at 442.

¶ 51   The *Belk* court found the trial court erred in admitting the police officer's lay opinion testimony that the individual in the video was the defendant because there was no basis to say the officer was more likely to correctly identify the defendant than the jury. *Id.*, 201 N.C. App. at 418, 689 S.E.2d at 443. The court concluded most of the factors it listed weighed against admission because the defendant had not altered his appearance, the person in the footage was not in a disguise, and there was no issue with surveillance footage clarity. *Id.* Further, while the officer had seen the defendant before, she had only seen him briefly, at most when she passed the defendant in her patrol car. *Id.*

¶ 52   Here, Investigator Barr did not identify Defendant in the video footage but rather was describing a car in the videos. Still, the principles regarding identification from *Buie* and *Belk* apply. First, we have found no cases in which a defendant challenged lay opinion testimony identifying a car as the defendant's car in video footage, but the general identification principles translate. Second, Barr was identifying the car in the video as Defendant's car. Barr had earlier in his testimony

described Defendant's car as "a 2002, silver or gray Acura" with a sunroof. Thus, when Barr described the car in the videos as "silver or gray" and as having a sunroof, he was identifying the car in the videos as Defendant's car.

¶ 53        Turning to the requirements of *Buie* and *Belk*, the trial court had a rational basis for concluding Barr was more likely than the jury to correctly identify the car in the videos as Defendant's car. *See Belk*, 201 N.C. App. at 417, 689 S.E.2d at 442. Focusing on *Belk*'s first factor and the key requirement of *Buie*, Barr had prior firsthand knowledge of Defendant's car that he subsequently identified in the videos. Barr viewed the car in the early morning hours after the shooting and, based on his experience from DWI cases while a patrol officer, had felt under the hood of the car to determine how recently it was driven. Beyond that initial check of the vehicle, Barr also stood near the vehicle and watched as the person who collected the GSR samples from the vehicle did her work. This is similar to *Mewborn* because Barr saw Defendant's car around the time he questioned Defendant, and, as in *Mewborn*, that provided sufficient firsthand knowledge for Barr to subsequently identify Defendant's car in surveillance videos. *Buie*, 194 N.C. App. at 732, 671 S.E.2d at 356 (citing *Mewborn*, 131 N.C. App. at 499, 507 S.E.2d at 909).

¶ 54        Beyond the first factor weighing heavily against him, *Belk's* remaining factors are neutral at best for Defendant. *Belk*'s second factor weighs in favor of permitting the testimony because Barr saw Defendant's car mere hours after the videos in which

he identified the car as Defendant's car were taken. To the extent it applies to a car, *Belk*'s third factor, disguise, tilts towards Defendant because the car in the video does not appear to have been disguised. The fourth *Belk* factor, alteration of appearance, does not apply here because unlike a defendant who would be in the courtroom, Defendant's car was not observed contemporaneously by the jury at trial. Finally, as to *Belk*'s fifth factor, we have no evidence about the quality of the video. Thus, the other factors produce an even split for Defendant at best.

¶ 55        Based on this review of the factors relevant in *Buie* and *Belk*, the trial court did not abuse its discretion in allowing Barr to identify Defendant's car by color and by its sunroof in the relevant videos. Contrary to Defendant's contention, Barr had the required firsthand knowledge because he was familiar with Defendant's car from viewing it in person before his testimony. As the *Buie* court made clear, Barr did not need to have firsthand knowledge of the events depicted in the videos; he only needed to have firsthand knowledge of Defendant's car so that he could "offer[] his interpretation of the similarities between evidence he had the opportunity to examine firsthand" and the videos. *See Buie*, 194 N.C. App. at 733, 671 S.E.2d at 356 (finding error because the witness was not able to do that). Because the trial court did not abuse its discretion, we find no error as to the lay opinion testimony issue.

## V. Plain Error Analysis

Defendant's three remaining arguments all contend the trial court committed plain error in making various evidentiary rulings. Because the plain error standard of review is the same for all three arguments, we first lay out that standard before analyzing each separate argument.

### A. Standard of Review

The plain error standard of review applies to unpreserved evidentiary errors. *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). In the definitive case on plain error, our Supreme Court explained:

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings[.]

*Id.* (quotations, citations, and alterations omitted). In other words, to prevail on plain error, a defendant must show not just that an error occurred but also that the error prejudiced him. *See id.* (describing how prejudice is necessary "[f]or error to constitute plain error"); *see also State v. Fisher*, 171 N.C. App. 201, 208, 614 S.E.2d 428, 433 (2005) ("A prerequisite to our engaging in a 'plain error' analysis is the

determination that the [trial court's action] constitutes 'error' at all." (quoting *State v. Torain*, 316 N.C. 111, 116, 340 S.E.2d 465, 468 (1986) (alterations in original))).

## B. Prior Consistent Statements

¶ 58 Defendant first argues the trial court plainly erred in admitting testimony by Tiffany Alston to corroborate testimony by Warren because "Warren's testimony directly conflicted with that of" Alston. Defendant contends that Warren's testimony contradicted two statements that Alston attributed to Warren while testifying. First, Alston testified Warren told her that Defendant confronted Warren over her relationship with the victim, but Defendant claims Warren never "state[d] that there was tension between" her and Defendant over her relationship with the victim and that Warren testified she could not recall a dispute over the subject. Second, Alston testified Warren told her the night of the shooting that "the bastard killed him"[5] with Alston believing Warren was referring to Defendant, but Defendant contends Warren testified that she never "pointed the finger at" Defendant, "including in her conversations with Ms. Alston." Defendant argues that because the statements Alston attributed to Warren did not add weight or credibility to Warren's testimony, and in fact "were contradictory" to such testimony, they "were improperly admitted under the guise of corroboration." (Quotations and citations omitted).

---

[5] Defendant misquotes Alston's testimony. She testified Warren said, "*that* bastard killed him" not "the bastard killed him." (Emphasis added.)

¶ 59    Defendant further asserts this error constituted plain error because it prejudiced him.  Defendant first argues, relying on *State v. Coleman*, 227 N.C. App. 354, 742 S.E.2d 346 (2013), that "plain error is more likely to be found when the error impacts 'the only controverted issue' in the case," as he alleges it did here where "the live issue for the jury was the identity of the killer."  Defendant further claims "the State's other evidence pointing to [Defendant's] guilt was not overwhelming" such that "the erroneously admitted evidence likely tipped the scales in favor of the State." (Quotations and citations omitted.)

¶ 60    While prior consistent statements are out-of-court statements, they are nonetheless admissible because they are "not offered for their substantive truth and consequently [are] not hearsay." *State v. Levan*, 326 N.C. 155, 167, 388 S.E.2d 429, 435 (1990).  "To be admissible, the prior consistent statement must first, however, corroborate the testimony of the witness." *State v. Lee*, 348 N.C. 474, 484, 501 S.E.2d 334, 341 (1998).  Corroborating statements "strengthen" and "add weight or credibility to a thing by additional and confirming facts or evidence." *Levan*, 326 N.C. at 166, 388 S.E.2d at 435 (quotations and citation omitted); *see also Williams*, 363 N.C. at 703, 686 S.E.2d at 503 ("Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness.") (quotations and citations omitted).  The prior statement can also contain new information that adds weight or credibility because the corroborative testimony must

only be "generally consistent with the witness's testimony" such that "slight variations will not render it inadmissible." *Williams*, 363 N.C. at 704, 686 S.E.2d at 503. But a past statement is not admissible as a prior consistent statement if it "actually directly contradict[s] . . . sworn testimony." *State v. McDowell*, 329 N.C. 363, 384, 407 S.E.2d 200, 212 (1991) (quotations and citation omitted) (ellipses in original); *see also State v. Stills*, 310 N.C. 410, 416, 312 S.E.2d 443, 447 (1984) (finding error when statements meant to be corroborative "in part . . . contradicted the substantive testimony").

¶ 61        Here, we address each of the two challenged instances in turn. Defendant first challenges Alston's testimony that Warren told her Defendant confronted Warren over her relationship with the victim. On this subject, Warren testified that she never talked with Defendant about her relationship with the victim and that she could not recall a 2014 incident when there was a dispute over that relationship. Alston testified that Warren told her Defendant had argued with Warren, taken her phone, and hit Warren because of her relationship with the victim. Thus, Alston's testimony about Warren's past statements was not admissible as a prior consistent statement because it contradicted Warren's sworn testimony. *See McDowell*, 329 N.C. at 384, 407 S.E.2d at 212 (stating a past statement is not admissible as a prior consistent statement when it contradicts sworn testimony). As a result, the trial court erred in admitting Warren's prior statements to Alston on this subject as prior consistent

statements.

¶ 62        The trial court did not, however, plainly err because Defendant cannot show the required prejudice. *See Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334 (requiring a defendant to demonstrate prejudice "[f]or error to constitute plain error"). The facts in Warren's past statement to Alston came into evidence through other means, specifically Warren's recorded statement to Barr the night of the shooting that we already determined was properly admitted. Since the jury heard the same facts from a different, admissible source, Defendant cannot show the error in admitting Alston's testimony about Warren's past statements on the subject "had a probable impact" on the jury finding Defendant guilty. *Id.* Therefore, the trial court did not plainly err in admitting Alston's testimony about Warren's past statements that Defendant confronted Warren over her relationship with the victim.

¶ 63        Turning to the second challenged instance—Alston's testimony that Warren told Alston the night of the murder, "that bastard killed him"—we reach a similar conclusion. Alston testified Warren told her "that bastard killed him" and Alston believed Warren was talking about Defendant. When asked about her actions the night of the shooting, however, Warren testified she did not ever blame Defendant or intend to blame him for the shooting.

¶ 64        Assuming *arguendo* the trial court erred in finding Alston's testimony about Warren's past statement to be admissible as a prior consistent statement, the trial

court did not plainly err. First, the most damaging part of Alston's testimony was not Warren's past statement but rather Alston's interpretation of the statement as referring to Defendant. Second, the jury heard other evidence indicating Warren was the source of the police's suspicions about Defendant because Investigator Barr testified that the night of the shooting Warren told him about her ex, *i.e.* Defendant, and then the police decided to go to Defendant's residence. Third, the State presented other significant evidence identifying Defendant as the perpetrator. Looking just at the evidence we have already reviewed, Warren's statements to Barr reveal Defendant was jealous of Warren's relationship with the victim to the point of violence, Defendant knew the victim was driving Warren's car around the time of the murder, the car Defendant admitted to driving was captured on surveillance footage of the shooting, and Defendant and his car tested positive for GSR particles mere hours after the shooting. Based on all this evidence, Defendant cannot show prejudice. *See id.*, 365 N.C. at 519, 723 S.E.2d at 334–35 (finding no prejudice when evidence against defendant was overwhelming). Therefore, we conclude the trial court did not plainly err on this second subject either.

**C. Victim's Statement that Defendant had Threatened to Kill Him**

¶ 65          Defendant next argues the trial court plainly erred in permitting testimony about the victim telling a witness that Defendant had threatened to kill the victim and Warren. Defendant contends this testimony was hearsay that did not fit within

the exception in North Carolina General Statute, § 8C-1, Rule of Evidence 803(3), which allows a statement of the declarant's then-existing state of mind. Defendant alleges Rule 803(3) does not apply here because it does not cover statements that merely recount factual events without emotion and the witness's testimony here showed the victim's statements "were devoid of the requisite emotion to be admitted . . . ." Defendant also argues this error prejudiced him by referring to his previous prejudice argument.

¶ 66     Rule 803(3) exempts from the bar against hearsay any of declarants' statements on then-existing mental, emotional or physical condition:

> The following are not excluded by the hearsay rule . . . :
> . . . .
> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

N.C. Gen. Stat. § 8C-1, Rule 803(3).

¶ 67     As the language of the Rule suggests, statements that purely express the declarant's state of mind, emotion, etc. are admissible. *See State v. Hardy*, 339 N.C. 207, 229, 451 S.E.2d 600, 612 (1994) (listing examples of a declarant's state of mind including "I'm frightened" or "I'm angry"). "Statements that merely recount a factual event are not admissible under Rule 803(3) because such facts can be proven with

better evidence, such as the in-court testimony of an eyewitness." *State v. Smith*, 357 N.C. 604, 609, 588 S.E.2d 453, 457 (2003) (citing *Hardy*, 339 N.C. at 229, 451 S.E.2d at 612). In the middle are statements of both facts and emotions. Such statements are still admissible when the "factual circumstances surrounding [the declarant's] statements of emotion serve only to demonstrate the basis for the emotions." *See State v. Gray*, 347 N.C. 143, 173, 491 S.E.2d 538, 550 (1997) (finding statements described in that way admissible under Rule 803(3)), *overruled in part on other grounds by State v. Long*, 354 N.C. 534, 557 S.E.2d 89 (2001). To summarize, statements that include only emotion or that include emotions and the facts underlying those emotions are admissible under Rule 803(3), but pure statements of fact are not. *See State v. Lesane*, 137 N.C. App. 234, 240, 528 S.E.2d 37, 42 (2000) ("Thus, to synthesize, our courts have created a sort of trichotomy in applying Rule 803(3). Statements that recite only emotions are admissible under the exception; statements that recite emotions and the facts underlying those emotions are likewise admissible; but statements that merely recite facts do not fall within the exception.").

¶ 68    Within this framework, our Supreme Court has "consistently held that a murder victim's statements that she fears the defendant and fears that the defendant might kill her are statements of the victim's then-existing state of mind." *State v. Hipps*, 348 N.C. 377, 392, 501 S.E.2d 625, 634–35 (1998) (collecting cases). For example, the Supreme Court said facts related to the defendant's prior assaults on

the murder victim were admissible when they helped demonstrate why the murder victim was afraid she was going to be killed. *Id.*, 348 N.C. at 391–92, 501 S.E.2d at 634; *see also Gray*, 347 N.C. at 172–73, 491 S.E.2d at 550 (holding evidence of husband-defendant's assaults on wife-murder victim was admissible to explain the victim's statements that she feared her husband was going to kill her). By contrast, our courts excluded statements by murder victims that contained only facts and no statements by the declarant about their state of mind or emotions. *Hardy*, 339 N.C. at 228–30, 451 S.E.2d at 611–13; *Lesane*, 137 N.C. App. at 240–41, 528 S.E.2d at 42 (so holding despite witness ascribing emotions to declarant).

¶ 69          Here, Defendant claims the following testimony was not admissible under Rule 803(3): "And Kenneth [the victim] told me that when he [Defendant] seen them [the victim and Warren] together that he told them if he see them again that he was going to kill them." While that statement does not convey any emotion itself, reading on in the transcript reveals that factual circumstance "serve[s] only to demonstrate the basis for the emotions." *Gray*, 347 N.C. at 173, 491 S.E.2d at 550. The subsequent testimony contains the following exchange:

> Q. Now, did Kenny [the victim] ever tell you whether or not
> he was afraid of [Defendant]?
> A. He told me that he was afraid of him *because the threats*
> *that was being made to him*.

(Emphasis added.) Thus, the fact of Defendant threatening the victim exists to

explain why the victim was afraid of Defendant. That is precisely the type of statement by a murder victim expressing fear of the defendant that our Supreme Court has long held admissible under Rule 803(3). *Hipps*, 348 N.C. at 391–92, 501 S.E.2d at 634; *Gray*, 347 N.C. at 172–73, 491 S.E.2d at 550. Therefore, the trial court did not err in admitting the victim's statement that Defendant had threatened him.

### D. Admission of Bullet

¶ 70    In Defendant's final plain error argument, he contends the trial court erred by "admitting evidence that Investigator Barr recovered a .45 caliber bullet from [Defendant]'s car because the bullet had no connection to the murder." (Capitalization altered.) Defendant argues, relying on case law, that ammunition unconnected to the charged crime and that does not have any tendency to prove any fact in issue is irrelevant and therefore inadmissible. (Citing *State v. Bodden*, 190 N.C. App. 505, 509, 661 S.E.2d 23, 26 (2008).) Defendant then cites to Barr's own testimony that the .45 caliber bullet did not have the same caliber as the murder weapon and argues testimony about the .45 caliber bullet was irrelevant and thus inadmissible. Defendant further argues this prejudiced him as required to meet the plain error standard and that the alleged plain error "necessitates a new trial."

¶ 71    "The admissibility of evidence is governed by a threshold inquiry into its relevance." *State v. Royster*, 237 N.C. App. 64, 68, 763 S.E.2d 577, 580 (2014) (internal quotations and citation omitted). "All relevant evidence is admissible,

except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by these rules. Evidence which is not relevant is not admissible." N.C. Gen. Stat. § 8C-1, Rule 402 (2019). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2019).

In the pertinent context here, weapons and ammunition are relevant and therefore admissible "where there is evidence tending to show that they were used in the commission of a crime." *See State v. Sierra*, 335 N.C. 753, 761, 440 S.E.2d 791, 796 (1994) (stating rule in the context of weapons and then applying it to ammunition on the facts of the case) (quotations and citation omitted). The reverse is also true; weapons and ammunition "that are not connected to the crime charged and which have no logical tendency to prove any fact in issue are irrelevant and inadmissible." *See Bodden*, 190 N.C. App. at 509–10, 661 S.E.2d at 26 (stating rule in terms of items in general and then applying it to ammunition on the facts of the case) (quotations and citation omitted). For example, in *Bodden*, this court excluded as irrelevant nine millimeter bullets when an agent from the State Bureau of Investigation testified either .38 or .357 caliber bullets were used in the shooting. *Id.*

Here, Defendant challenges the admission of testimony concerning a .45

caliber bullet. Barr testified that the .45 caliber bullet "did not match the crime scene" and that the murder weapon "was a .40 caliber" gun. Thus, as in *Bodden*, the testimony concerning the .45 caliber bullet was irrelevant and thus inadmissible because it was "not connected to the crime charged" and had "no logical tendency to prove any fact in issue." *Bodden*, 190 N.C. App. at 509, 661 S.E.2d at 26. Therefore, the trial court erred in admitting testimony about the .45 caliber bullet.

¶ 74    The trial court's error does not amount to plain error, however. To satisfy the plain error standard, Defendant would have to show prejudice, *i.e.* that "after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334. Removing the mention of the .45 caliber bullet would not have been likely to change the result of the trial. At worst, the .45 caliber bullet brought before the jury evidence which may tend to suggest Defendant had some association with a gun other than the one used in the murder. But the jury already heard evidence Defendant and his car both tested positive for gunshot residue based on swabs taken the night of the crime. Thus, the bullet did not draw any connection between Defendant and guns that had not already been drawn. Based on this evidence, as well as the prior prejudice analysis above, we find the error did not have a probable impact on the jury's finding that Defendant was guilty. *Id.* Therefore, the trial court did not plainly err when it admitted testimony about the .45 caliber bullet.

## VI.    Cumulative Error

Finally, Defendant argues "the cumulative effect of the errors requires a new trial" even if the errors individually do not warrant a new trial. "Cumulative errors lead to reversal when taken as a whole they deprived the defendant of his due process right to a fair trial free from prejudicial error." *State v. Wilkerson*, 363 N.C. 382, 426, 683 S.E.2d 174, 201 (2009) (citations, quotations, and alterations omitted). Here, the only errors we find do not amount to plain errors. The State argues, based on *State v. Holbrook*, 137 N.C. App. 766, 529 S.E.2d 510 (2000), that plain error doctrine cannot be applied cumulatively, *i.e.* that plain errors taken together cannot amount to cumulative error. On the facts here, we do not need to reach that argument or make such a sweeping statement. As laid out above, the errors individually had, at most, a miniscule impact on the trial because the facts underlying the evidence admitted in error or the implications thereof came in through other means and the jury heard extensive other evidence implicating Defendant in the killing. Even combining the two errors would not lead to a situation that deprived Defendant of his right to a fair trial. *Wilkerson*, 363 N.C. at 426, 683 S.E.2d at 201. Therefore, we do not find any cumulative error.

## VII.    Conclusion

After reviewing each of Defendant's contentions, we find no prejudicial error in this case. After *de novo* review, the trial court did not err in admitting Warren's

past statements under Rule 803(5).  Further, the trial court did not abuse its discretion in admitting the testimony from the State's GSR expert or from Investigator Barr identifying Defendant's car in surveillance videos.  Finally, the trial court did not plainly err in admitting testimony as a prior consistent statement, in admitting testimony pursuant to Rule 803(3), and in admitting testimony about a bullet found in Defendant's car.  We also find no cumulative error.

NO PREJUDICIAL ERROR.

Judges ARROWOOD and JACKSON concur.